TRANSPORT WORKERS UNION OF AMERICA, LOCAL 100, AFL–CIO; Roger Toussaint, as President of Transport Workers Union of America, Local 100, AFL–CIO; Transport Workers Union of America, AFL–CIO; Sonny Hall, as President of Transport Workers Union of America; AFL–CIO; Amalgamated Transit Union, Local 726, AFL–CIO; and Angelo Tanzi, as President of Amalgamated Transit Union, Local 726, AFL–CIO, Plaintiffs,

v.

NEW YORK CITY TRANSIT AUTHORITY and Manhattan and Bronx Surface Transit Operating Authority, Defendants.

No. 02 Civ. 7659(SAS).

United States District Court, S.D. New York.

April 12, 2004.

Walter M. Meginniss, Jr., Margaret A. Malloy, Gladstein, Reif & Meginniss, LLP, New York, New York, for Plaintiffs Local 100, Roger Toussaint, Local 726, and Angelo Tanzi.

David B. Rosen, Transport Workers Union of America, New York, New York, for Plaintiffs TWU and Sonny Hall.

Richard Schoolman, Michele Sheridan, New York City Transit Authority, Brooklyn, New York, for Defendants.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

This case presents two important questions concerning the Americans with Disabilities Act (ADA).[1] *First*, whether a labor union has standing to assert claims of employment discrimination on behalf of, or regarding, its members under either Title I or Title II of the ADA. And *second*, whether a claim of employment discrimination may be maintained under Title II, as opposed to Title I, of the ADA. Because I answer both questions in the affirmative, the defendants' motion to dismiss is denied in its entirety.

## I. THE COMPLAINT

The allegations of the complaint are remarkably straightforward and can be summarized, for the purposes of this motion, as follows. Plaintiffs are three labor unions (and their respective presidents): Transport Workers Union of America, Local 100; Local 100's parent union, the Transport Workers Union of America; and Amalgamated Transit Union, Local 726 (collectively, the "Unions").[2] Defendants New York City Transit Authority and Manhattan and Bronx Surface Transit Operating Authority (collectively, the "Authority") operate mass transit within New York City. The Unions collectively represent the majority of the Authority's hourly employees who work in the subways and bus depots in Manhattan, the Bronx, and Brooklyn.[3]

In this action, the Unions are challenging a sick leave policy codified in the collective bargaining agreement negotiated by the Authority and the Unions.[4] (As a historical matter, the policy predated the existence of the bargaining agreement and is contained in the current agreement because of the ruling of an independent arbitration panel in 1982. The Unions have objected to enforcement of the policy since at least 2002, and possibly as early as 1991.)[5] Under the terms of the challenged policy – the details of which are not relevant here – Authority employees who seek sick leave must produce documentation containing a diagnosis and treatment plan, and may have to submit to medical examinations.[6] The Unions complain that this policy discriminates against their members, in violation of the ADA.

Although the sick leave policy does not "discriminate" in the ordinary sense of treating some people less favorably than

---

1. 42 U.S.C. § 12101, *et seq.* Unless otherwise noted, all statutory citations are to Title 42 of the United States Code.

2. *See* Third Amended Complaint ("Compl.") ¶¶ 5–10.

3. *See id.* ¶¶ 5, 14.

4. *See id.* ¶ 5.

5. *See* Declaration of Julio Rivera in Opposition to Defendants' Motion to Dismiss Plaintiffs' Claims Under Title I of the Americans with Disabilities Act ("Rivera Decl.") ¶¶ 4–10, 12. Rivera is the Vice President of Local 100. *See id.* ¶ 1.

6. *See* Compl. ¶¶ 15–23.

others,[7] Title I of the ADA defines discrimination as including "medical examinations and inquiries."[8] In particular,

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.[9]

Unless the Authority can demonstrate a "business necessity" – an issue not presented by this motion – it is easy to see that the challenged sick leave policy may run afoul of the ADA.[10]

The Unions assert two causes of action, both on their own behalf and on behalf of their members, alleging unlawful discrimination in violation of the ADA. The first claim is premised on Title II of the ADA, which prohibits discrimination by any "public entity" on account of a person's disability.[11] The Unions' second claim is based on Title I of the ADA, which prohibits employment discrimination by any "covered entity."[12] The Authority concedes, as it must, that it is both a "public entity" within the meaning of Title II of the ADA, as well as a "covered entity" within the meaning of Title I.[13] The Authority moves to dismiss this case in its entirety, arguing that the Unions lack standing to assert these claims, and that, in any case, Title II of the ADA does not give rise to claims for employment discrimination.[14]

## II. LEGAL STANDARD

"Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint *only* if it is clear that no relief could be granted under *any* set of facts that could be proved consistent with the allegations.' "[15] Thus, a plaintiff need only plead " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."[16] Sim-

---

7. *See* Oxford English Dictionary (2d ed.1989).

8. § 12112(d)(1).

9. § 12112(d)(4)(A).

10. *See Conroy v. New York State Dep't of Correctional Services*, 333 F.3d 88, 92 (2d Cir. 2003) (holding that a sick leave policy that "requires employees to submit general diagnoses as part of a medical certification procedure following certain absences" runs afoul of § 12112(d)(4)(A) absent a showing of "business necessity"). Whether the Authority can demonstrate a "business necessity" for its sick leave policy is not an issue presented here, and is properly reserved for summary judgement or, more likely, trial *See id.* at 97–98 (explaining the business necessity standard); *Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir.2001) (same).

11. § 12132.

12. § 12112(a).

13. Title I defines a "covered entity" as "an employer, employment agency, labor organi-

zation, or joint labor-management committee." § 12111(2). Title II defines a "public entity" as including "any department, agency, special purpose district, or other instrumentality of a State or States or local government." § 12131(1)(B).

14. Although I refer to the Authority's "motion to dismiss," there are actually two motions pending. The Unions originally asserted only one claim under Title II. In response to issues raised at oral argument on the Authority's motion to dismiss, the Unions sought – and received – leave to amend the complaint to include a claim under Title I. The Authority then submitted a second motion to dismiss that claim as well.

15. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (emphasis added) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

16. *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (quoting Fed.R.Civ.P. 8(a)).

ply put, "Rule 8 pleading is extremely permissive."[17]

At the motion to dismiss stage, the issue " 'is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test.' "[18]

The task of the court in ruling on a Rule 12(b)(6) motion is " 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' "[19] When deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor.[20]

## III. DISCUSSION

The Unions assert claims of discrimination under Titles I and II of the ADA. Title I explicitly addresses employment discrimination, prohibiting discrimination based on a person's disability with respect to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[21] Peculiar to Article I's definition of discrimination is that it "include[s] medical examinations and inquiries."[22] Article II, on the other hand, provides in relevant part:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.[23]

Unlike Title I (and Title III), Title II contains no specific definition of the term "discrimination" at all, much less the particular provision regarding medical examinations and inquiries.

The Authority thus asserts two independent bases for dismissing the Unions' claims. *First,* it argues that because the Unions themselves have not been discriminated against by virtue of the Authority's sick leave policy, they have no standing to sue under the ADA. *Second,* even if the Unions do have standing, their claim under Title II must be dismissed because that title does not permit claims of employment discrimination. As standing may be jurisdictional, I address that argument first.[24]

---

**17.** *Wynder v. McMahon,* 360 F.3d 73, 76 (2d Cir.2004).

**18.** *Phelps v. Kapnolas,* 308 F.3d 180, 184–85 (2d Cir.2002) (per curiam) (quoting *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998)).

**19.** *Pierce v. Marano,* No. 01 Civ. 3410, 2002 WL 1858772, at *3 (S.D.N.Y. Aug.13, 2002) (quoting *Saunders v. Coughlin,* No. 92 Civ. 4289, 1994 WL 88108, at *2 (S.D.N.Y. Mar. 15, 1994)).

**20.** *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002).

**21.** § 12112(a).

**22.** § 12112(d)(1); *see also* § 12112(d)(4)(A).

**23.** § 12132.

**24.** *See Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 126–27 (2d Cir.2003) ("It is clear that constitutional standing is a jurisdictional prerequisite to suit.") (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)); *see also United States v. Hays,* 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.' ") (alterations in original) (quoting *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 230–31, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)). But where the question of standing does not rise to a constitutional level, standing is not jurisdictional. *See, e.g., Lerner,* 318

## A. Standing

Standing can be constitutional or prudential. Constitutional standing arises from the "case or controversy" requirement of Article III, whereas prudential standing involves "judicially self-imposed limits on the exercise of federal jurisdiction...." [25] Included in this latter category is "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." [26] Also included within the broad rubric of prudential standing is statutory standing, the requirements laid out by act of Congress for who may bring suit.[27] In this case, the Authority challenges the Unions' standing to sue both under Article III and under the ADA.

### 1. Statutory Standing Under the ADA

■ The Authority makes a lengthy argument as to why it believes the Unions are not proper plaintiffs under the ADA. In fact, the Authority reads a standing requirement into the text of the ADA that does not exist.

With respect to Article II of the ADA, the Authority contends that only a "qualified individual with a disability" [28] – which obviously excludes the Unions – has standing. This is a misreading of the statute. It is true that Title II prohibits discrimination *against* such qualified individuals; Title II provides a cause of action, however, for *"any person alleging* discrimination on the basis of disability." [29] Title II therefore imposes no standing requirement whatsoever. If there was any doubt about this fact, it was definitively dispelled by the Second Circuit, which held that "the use of such broad language in the enforcement provisions of the statute[ ] evinces a congressional intention to define standing to bring a private action under ... Title II as broadly as is permitted by Article III of the Constitution." [30]

Title I similarly imposes no statutory standing requirement. Indeed, Title I contains the same enforcement language as does Title II, specifying that the "powers, remedies, and procedures" provided to *"any person alleging* discrimination on the basis of disability" are supplied by Title VII of the Civil Rights Act of 1964.[31] And even if one looks to the language of Title VII, as the Authority urges, that statute provides a remedy for any "person aggrieved," [32] language just as sweeping, if

F.3d 113 (holding that RICO standing is not jurisdictional); *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 397–99 (3d Cir. 2000) (treating antitrust standing as non-jurisdictional).

**25.** *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

**26.** *Id.*

**27.** *See Lerner*, 318 F.3d at 127.

**28.** § 12132.

**29.** § 12133 (emphasis added) ("The remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, proce-

dures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title.").

**30.** *Innovative Health Sys. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir.1997) (quotation marks, citations, and brackets omitted).

**31.** § 12117(a) (emphasis added). The relevant enforcement provisions of Title VII are contained in sections 2000e–4, 2000e–5, 2000e–6, 2000e–7, and 2000e–9.

**32.** § 2000e–5(f).

not broader, than that used in the ADA itself. Indeed, such language has consistently been interpreted – in Title VII as well as other statutes – by appellate courts as conferring standing on all persons who otherwise have standing under Article III of the Constitution.[33]

In sum, neither Title I nor Title II of the ADA imposes a statutory standing requirement. The only question, therefore, is whether the Unions have Article III standing.

## 2. Constitutional Standing

■ The Unions advance two independent bases for their standing. *First,* the Unions argue that they have standing in their own right, as a party aggrieved by the Authority's sick leave policy. *Second,* they argue that they also have associational standing to sue on behalf of their members, who are subject to the challenged policy and unquestionably have standing.[34]

### a. The Unions' Standing in Their Own Right

■ The Supreme Court has explained the elements of Article III standing as follows:

It is by now well settled that "the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact' – an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[35]

The burden "clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute" falls decisively on "the party who seeks the exercise of jurisdiction in his favor."[36] These

**33.** *See Kyles v. J.K. Guardian Security Services, Inc.,* 222 F.3d 289, 297–98 (7th Cir. 2000) (holding that the words "person claiming to be aggrieved" in Title VII evinces "a congressional intent to extend standing to the outermost limits of Article III"); *Anjelino v. New York Times Co.,* 200 F.3d 73, 91 & n. 25 (3d Cir.1999); *Equal Employment Opportunity Comm'n v. Mississippi College,* 626 F.2d 477, 482–83 & n. 7 (5th Cir.1980); *Waters v. Heublein, Inc.,* 547 F.2d 466, 469–70 (9th Cir.1976); *Gray v. Greyhound Lines, East,* 545 F.2d 169, 176 (D.C.Cir.1976); *Local 194, Retail, Wholesale & Dep't Store Union v. Standard Brands, Inc.,* 540 F.2d 864 (7th Cir. 1976); *Equal Employment Opportunity Comm'n v. Federal Express Corp.,* 268 F.Supp.2d 192, 198 (E.D.N.Y.2003). *See also Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (holding that "person claiming to be aggrieved" language in section 810(a) of the Civil Rights Act of 1968, 42 U.S.C. § 2610(a), confers standing "as broadly as is permitted by Article III of the Constitution") (quoting *Hackett v. McGuire Bros., Inc.,* 445 F.2d 442,

446–47 (3d Cir.1971)); *Innovative Health Sys.,* 117 F.3d at 47 (holding that "any person aggrieved" language in Rehabilitation Act, 29 U.S.C. § 794a(a)(2), does not impose standing requirement beyond that of Article III). The Second Circuit, however, specifically declined to address the question of whether Title VII imposes standing requirements apart from those contained in Article III. *See Leibovitz v. New York City Transit Authority,* 252 F.3d 179, 186–87 (2d Cir.2001).

**34.** *See Conroy,* 333 F.3d at 93–95 (holding that an employee has standing to sue for a violation of § 12112(d)(4)(A), regardless of whether she actually has a disability).

**35.** *United States v. Hays,* 515 U.S. 737, 742–43, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (alterations in original) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

**36.** *Id.* at 743, 115 S.Ct. 2431 (citations omitted).

requirements apply equally to organizations – such as labor unions – as to natural persons.[37]

 In this case, the Unions have alleged a concrete harm that is causally linked to the Authority's sick leave policy: the expenditure of resources while representing employees in grievance and arbitration hearings regarding sick leave, and the attendant diversion of those resources from other union activities.[38] Moreover, this injury will be remedied (at least, going forward) if the allegedly illegal aspects of the sick leave policy are struck down. This is precisely the sort of injury that courts have historically found provides an organization standing to sue on its own behalf.[39] This case is no exception. Thus, the Unions have standing to sue in their own right.

### b. Associational Standing

 Completely apart from the harms that provide standing to the Unions on their own behalf, they argue that they also have "associational standing" – that is, standing to sue on behalf of their constituents.[40] The Second Circuit has very recently had occasion to address the requirements for an organization to assert associational standing:

> In determining whether an association has standing to maintain a suit to redress its members' injuries, rather than an injury to itself, we apply a three-pronged test. Under this test, the association has standing if (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.[41]

---

**37.** *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 n. 19, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982).

**38.** *See* Compl. ¶¶ 27–28; *see also* Declaration of Walter M. Meginniss, Jr., in Opposition to Defendants' Motion to Dismiss Plaintiffs' Claims Under Title I of the Americans with Disabilities Act ¶ 8. Although the Unions' complaint does not include allegations that the Transport Workers Union itself – as opposed to its local union, Local 100 – participates in these proceedings, there is evidence that it does. *See* Meginniss Decl. ¶ 8. In any case, because I find that all three plaintiffs have associational standing, *see infra* Part III. A.2.b, it does not matter whether all three also have injuries in their own right.

**39.** *See, e.g., Havens,* 455 U.S. at 379, 102 S.Ct. 1114 (holding that where organization had to devote resources to counteract defendant's unlawful practices, "there can be no question that the organization has suffered an injury in fact. Such concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources – constitutes far more than simply a setback to the organization's abstract social interests."); *Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898, 905 (2d Cir.1993)

(finding standing for housing organizations forced to divert resources away from other activities to investigate and challenge defendants' discriminatory housing practices); *Padberg v. McGrath–McKechnie,* 203 F.Supp.2d 261, 275 (E.D.N.Y.2002) (organization that represented drivers had standing where defending drivers subject to discipline under challenged city initiative caused it to divert resources from other activities.).

**40.** *See Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("Even in the absence of injury to itself, an [organization] may have standing solely as the representative of its members.").

**41.** *Bano v. Union Carbide Corp.,* 361 F.3d 696 (2d Cir.2004) (quotation marks and citations omitted). *See also Irish Lesbian & Gay Org. v. Giuliani,* 143 F.3d 638, 649 (2d Cir.1998).

The Authority cites a different test, relying on *Wasser v. New York State Office of Vocational and Educational Services for Individuals with Disabilities:*

> In general, litigants lack standing to raise claims on behalf of other individuals. Under Supreme Court precedent, a plaintiff must meet three requirements in order to

The Unions easily meet the requirements of this test. *First,* in *Conroy v. New York State Department of Correctional Services,* the Second Circuit squarely held that an employee has standing to challenge her employer's sick leave policy under the ADA. Although *Conroy* apparently involved only a Title I claim, for the reasons discussed above, the contours of standing under Title I and Title II are precisely the same (and are coterminous with the reach of Article III of the Constitution). Because the Unions' constituents are employees of the Authority subject to the sick leave policy, they have standing to sue.[42]

*Second,* the interests that the Unions seek to protect here – the quality of working conditions and conditions of employment – are obviously germane to the Unions' purpose.[43] Indeed, that the sick leave policy is codified in an agreement collectively bargained by the Authority and the Unions is powerful proof of the Unions' interest in the policies its members are subject to.

*Third,* and finally, no individual employee's participation is required to adjudicate the Unions' claims or grant its requested relief. Ordinarily, claims for injunctive relief, as opposed to damages, will satisfy this requirement.[44] Under this prong, however, an "organization lacks standing to assert claims of injunctive relief on behalf of its members where 'the fact and extent' of the injury that gives rise to the claims for injunctive relief 'would require individualized proof,' or where 'the relief requested would require the participation of individual members in the lawsuit.' "[45]

Here, the Unions "seek[ ] a purely legal ruling without requesting that the federal

---

establish such third-party standing. First, the plaintiff must have suffered an injury in fact; second, the litigant must have a close relationship with the third party; third, there must exist some hindrance to the third parties' ability to protect their own interests. *See Powers v. Ohio,* 499 U.S. 400, 410, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). No. 01 Civ. 6788, 2003 WL 22284576, at *16 (E.D.N.Y. Sept.30, 2003) (parallel citations omitted). Not surprisingly, the Authority argues vehemently (and quite possibly correctly) that the Unions cannot satisfy the third prong of this test.

The test cited by the Authority, however, is not for associational standing. Rather, it is the test for determining whether a party may assert third-party standing. Thus, in *Powers,* the question was whether a criminal defendant had standing to raise equal protection claims on behalf of a juror excluded from his trial. *See* 499 U.S. at 410, 111 S.Ct. 1364. And in *Wasser,* the question was whether one individual could raise third-party claims under the Rehabilitation Act. *See* 2003 WL 22284576, at *16. Where an organization represents its constituents, however, the slightly different test for associational standing, as most recently articulated in *Bano,* applies.

42. To the extent that exhaustion of administrative remedies can be considered a standing requirement imposed by Title I, I note that the Unions filed charges of discrimination with the EEOC and have received right-to-sue letters. *See* Exs. A–D to Compl.

43. *See* Compl. ¶¶ 27–28 (alleging that "one of the primary organization purposes" of the Unions "is to preserve its members' continued employment and to protect their rights in relation to the terms and conditions of their employment").

44. *See Warth,* 422 U.S. at 515, 95 S.Ct. 2197 ("if in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been this kind.").

45. *Bano,* 361 F.3d at 714 (brackets omitted) (quoting *Warth,* 422 U.S. at 515–16, 95 S.Ct. 2197; *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).

courts award individualized relief to its members."[46] The Second Circuit has held that under such circumstances, the third prong of the associational standing test is satisfied.[47] There is no reason to believe that the Unions' claims are anything but generic: they are making a facial challenge to a sick leave policy that applies equally to all employees. The only questions on the merits are, first, whether the policy offends the ADA and second, whether the Authority can demonstrate a "business necessity" for that policy. Neither of these questions turn on the claims of individual employees.[48] Nor does the relief requested – essentially, an invalidation of the sick leave policy – require any individualized attention.

### c. Estoppel

█ As a fall-back position, the Authority argues that even if the Unions have standing under the ordinary rules, they have waived their standing to object to the sick leave policy by virtue of the policy's inclusion in the collective bargaining agreement. The existence of the challenged policy in a collective bargaining agreement, however, does not alter the standing calculus.

The nature of collective bargaining is that it is a negotiation – one party relinquishes something (either by lowering its demands or agreeing to a provision that the other party values) in order to receive a concession that it deems more worthwhile. Therefore, in order to eliminate the sick leave policy from the collective bargaining agreement, the Unions would have been required to sacrifice some other benefit for their members. But if the policy is not legal, the Unions should not have to make that sacrifice.[49] This is especially true where, as here, the challenged policy was inserted unilaterally by the Authority into the original collective bargaining agreement. Thus, the Unions would have been required to bargain to remove a preexisting policy that the Authority valued;

---

**46.** *Id.*

**47.** *See id; see also International Union, United Automobile, Aerospace & Agricultural Implement Workers of Am. v. Brock,* 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986) (holding that union had associational standing where its claims "raise[d] a pure issue of law" that could be litigated "without the participation of [ ] individual claimants").

**48.** I recognize – although the Authority does not make this argument – that the Authority may proffer different purported "business necessities" for different classes of employees. For example, its reason for requiring documentation from bus drivers may be different from its reason for requiring the same documentation from file clerks. However, those differences apply to broad classes of employees and do not turn on attributes unique to any *individual* employee, and certainly would not require participation by any individual employee.

**49.** *See Thompson v. Board of Ed. of Romeo Community Schools,* 71 F.R.D. 398, 406 (W.D.Mich.1976), *rev'd on other grounds,* 709 F.2d 1200 (6th Cir.1983). The *Thompson* court addressed precisely this question:

> The defendants have argued that the [plaintiff organization] could have negotiated a contract which would not have violated Title VII, if it had been willing to give up other benefits. That is not relevant. If the [ ] master contract, as it exists, does violate Title VII, the education association need not agree to give up any benefits as a condition precedent to having the sick leave provisions of the collective bargaining agreement changed to include pregnancy related disabilities. While the school district may have to skillfully negotiate other aspects of the collective bargaining agreement, if it views the statute as imposing increased costs, the school board cannot condition a statutorily mandated change upon the association's agreement to other nonmandated provisions.

*Id.*

the cost of winning that concession would likely have been considerable.[50]

The Authority argues that if a court strikes the sick leave policy from the collective bargaining agreement, it will have lost the benefit of its bargain. Nonetheless, a party imposing an illegal provision in a collective bargaining agreement bears the risk that the provision will be struck down.[51] In short, the presence of the sick leave policy in the collective bargaining agreement is irrelevant to the Unions' standing.

\* \* \* \* \* \*

In sum, the Unions have demonstrated the necessary elements of associational standing and can therefore prosecute this suit on behalf of their members. In addition, the Unions have demonstrated an actual injury to themselves, meeting the requirements for standing under Article III to pursue their claim on their own behalf.

## B. Employment Discrimination Under Title II of the ADA

■ Having determined that the Unions are proper plaintiffs in this case, I turn now to the only other question presented by the Authority's motion: whether Title II of the ADA may give rise to claims of employment discrimination. Title II provides:

> Subject to the provisions of this [title], no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.[52]

The question, then, is whether this provision contemplates employment discrimination.[53] In particular, the question is

---

**50.** To be sure, this argument can also run the other way: the Authority could lower its other demands or agree to some provision valued by the Unions in order to keep the sick leave policy in the collective bargaining agreement.

**51.** *See, e.g., United Teachers – Los Angeles v. Board of Ed. of City of Los Angeles,* No. CV 81–2121, 1982 WL 312 (C.D.Cal. Mar.3, 1982) ("Plaintiff, by virtue of signing the collective bargaining agreement which excludes spouses of male employees from pregnancy-related insurance benefits, was not estopped nor deemed to have waived its right to assert a violation of Section 701 of Title VII on behalf of its male members.") (citing *Social Services Union, Local 535 v. County of Santa Clara,* 609 F.2d 944, 947 (9th Cir.1979)), *aff'd,* 712 F.2d 1349 (9th Cir.1983).

**52.** § 12132.

**53.** A related question is whether "discrimination" in Title II includes the prohibition on medical inquiries – a definition explicitly contained only in Titles I and III of the ADA. Indeed, the Authority argues forcefully that canons of construction require me to find that Congress' omission of a definition of discrimination in Title II was intentional and meaningful. While this argument is appealing, *see, e.g., City of Chicago v. Environmental Defense Fund,* 511 U.S. 328, 337–38, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994); *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.") (quotation marks omitted), the Second Circuit has explicitly held that the definitions of discrimination contained in Titles I and III are also incorporated into Title II:

> Title II sets out only a general definition of discrimination. By listing specific examples of discriminatory behavior in the other two titles, Congress surely did not intend to excuse similar discriminatory conduct by a public entity simply because such conduct is not spelled out in Title II. This commonsense interpretation of Title II is confirmed by the legislative history. The House Committee on Education and Labor indicated that Title II's prohibitions are to be "identical to those set out in the applicable provisions of titles I and III of this legislation." H.R.Rep. No. 101–485(II), at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367.

*Innovative Health Sys.,* 117 F.3d at 47 (citing *Kinney v. Yerusalim,* 9 F.3d 1067, 1073 n. 6 (3rd Cir.1993) (legislative history indicates

whether the phrase "or be subjected to discrimination" can be read expansively, to include employment discrimination, or whether it refers back to discrimination in the "services, programs, or activities of a public entity."[54]

In this case – because the Unions have also sued under Title I – the question is somewhat academic. As a general matter, however, whether Title II covers employment discrimination by public entities is an important question. Among other reasons, a Title I plaintiff is required to exhaust her administrative remedies before filing a federal suit: she must make a timely complaint to the EEOC, receive a right-to-sue letter, and then file suit within 300 days.[55] A Title II plaintiff is not subject to any of these requirements.[56] In any event, the Unions are certainly entitled to pursue their claims under multiple legal theories.[57]

At the outset, I note that the Unions' assertion that the Second Circuit, in *Innovative Health Systems*, resolved this issue is incorrect. There, the court wrote:

> [T]he language of Title II's anti-discrimination provision does not limit the ADA's coverage to conduct that occurs in the "programs, services, or activities" of the City. Rather, it is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context, and that should avoid the very type of hair-splitting arguments the City attempts to make here.[58]

The seemingly broad scope of the court's language notwithstanding, it is important to read these words in context.[59] *Innovative Health Systems* concerned a challenge to an allegedly discriminatory zoning decision, and the question presented there was whether zoning decisions are "programs, services, or activities" of a locality, or are otherwise covered by Title II.[60] As the

---

that Titles II and III are to be read consistently)).

54. Some courts have held that employment is one of the "services, programs, or activities" of public entities, and that employment discrimination is covered by Title II by virtue of that language. *See, e.g., Dominguez v. City of Council Bluffs, Iowa*, 974 F.Supp. 732, 736–37 (S.D.Iowa 1997). Because I conclude that the second clause of Title II – the general prohibition on discrimination – covers employment discrimination, I do not address that contention. I note, however, that the Second Circuit construed identical language contained in the Rehabilitation Act to include "all of the operations" of the entity, *see Innovative Health Sys.*, 117 F.3d at 44 (quoting 29 U.S.C. § 794(b)(1)(A)). Under so broad a definition, the Second Circuit might well conclude that employment discrimination is covered under the "services, programs, or activities" language of Title II. *See Zimmerman v. Oregon Dep't of Justice*, 183 F.3d 1161, 1163 (9th Cir.1999) (Reinhardt, J., dissenting from denial of rehearing *en banc*) ("The plain and ordinary meaning of 'activity' clearly does not exclude hiring or employing workers. Indeed, putting people to work is often the chief 'activity' of municipalities.").

55. *See* § 12117 (applying Title VII's procedures to Title I claims); § 2000e–5 (requiring Title VII plaintiffs to exhaust administrative remedies).

56. *See* § 12133 (applying Rehabilitation Act's procedures to Title II claims); 29 U.S.C. § 794a (setting forth Rehabilitation Act's procedures, which do not include exhaustion).

57. *See* Fed.R.Civ.P. 8(e)(2).

58. 117 F.3d at 45.

59. *See, e.g., American Fiber & Finishing, Inc. v. Tyco Healthcare Group, LP*, 362 F.3d 136, 139–40 (1st Cir.2004) (declining to read Supreme Court's statement in *Freeport–McMo-Ran, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428, 111 S.Ct. 858, 112 L.Ed.2d 951 (1991) (per curiam), literally because "it is risky to read judicial pronouncements in a vacuum, and adding context makes it pellucid that the quoted language cannot be taken literally.").

60. *See Syken v. State of New York*, No. 02 Civ. 4673, 2003 WL 1787250, at *11 (S.D.N.Y. Apr.2, 2003) (distinguishing *Innovative Health Systems* from cases asserting employment discrimination under Title II).

Second Circuit subsequently made clear, whether Title II of the ADA covers employment discrimination claims remains an open question.[61] I turn, then, to the words of the statute itself.[62]

### 1. Plain Language of Title II

"The preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there. Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous." [63] In conducting this analysis, however, statutory language must not be taken out of context, or examined outside of the overall structure and purpose of the law that contains it.[64] In this case, the plain language of Title II is informed by the ADA as a whole, as well as by the Rehabilitation Act and Title VII of the Civil Rights Act of 1964, both of which are referenced in the ADA and are part of the same legislative scheme.[65]

**61.** *See Mullen v. Rieckhoff*, 189 F.3d 461, 1999 WL 568040 (2d Cir.1999) (unpublished) ("We do note, however, that plaintiff rightly points to a split of authority over whether an employment discrimination plaintiff may avoid the ADA's requirement of an EEOC charge by filing under Title II of that Act. As Mullen's ADA claim is also time-barred, we need not reach that question.") (citations omitted); *see also Sworn v. Western N.Y. Children's Psychiatric Center*, 269 F.Supp.2d 152, 157 & n. 2 (W.D.N.Y.2003) (citing *Mullen*); *Syken*, 2003 WL 1787250, at * 7 ("The Second Circuit has not yet resolved the issue"); *Winokur v. Office of Court Administration*, 190 F.Supp.2d 444, 449 (E.D.N.Y.2002) ("Apparently, the Second Circuit has not yet resolved this issue.").

Although it has no bearing on whether the question has been conclusively decided in the Second Circuit, the Supreme Court has also noted (without citing *Innovative Health Systems*) a split of authority on this question. *See Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 360 n. 1, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) ("[N]o party has briefed the question whether Title II of the ADA, dealing with the 'services, programs, or activities of a public entity,' is available for claims of employment discrimination when Title I of the ADA expressly deals with that subject. We are not disposed to decide the . . . issue . . . .") (citations omitted).

**62.** I note, however, that I do not write on a clean slate. Many courts have considered precisely this question. The weight of authority answers that question in the affirmative, although the majority of the most recently decided cases answer it in the negative. *See Sworn*, 269 F.Supp.2d 152 (citing cases). Fittingly, the two appellate courts that have taken up the issue are split. *Compare Zimmer-*

*man v. Oregon Dep't of Justice*, 170 F.3d 1169 (9th Cir.1999) (holding that Title II does not cover employment discrimination) *with Bledsoe v. Palm Beach County Soil and Water Conservation District*, 133 F.3d 816 (11th Cir. 1998) (holding that it does).

**63.** *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 124 S.Ct. 1587, 1593, 158 L.Ed.2d 338 (2004) (plurality opinion) (quotation marks, citations, and brackets omitted).

**64.** *See Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

**65.** *See generally Branch v. Smith*, 538 U.S. 254, 281, 123 S.Ct. 1429, 155 L.Ed.2d 407 (2003) ("[I]t is, of course, the most rudimentary rule of statutory construction . . . that courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part, including later-enacted statutes: 'The correct rule of interpretation is, that if divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them. . . . If a thing contained in a subsequent statute, be within the reason of a former statute, it shall be taken to be within the meaning of that statute . . .; and if it can be gathered from a subsequent statute in *pari materia*, what meaning the legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute.' ") (quoting *United States v. Freeman*, 3 U.S. (How.) 556, 564–565 (1845)).

The ADA was enacted to redress "discrimination against individuals with disabilities ... in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." [66] Thus, in drafting the ADA, Congress sought "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disability." [67] Taken together, Title VII, the Rehabilitation Act, and the ADA provide a comprehensive regime designed to combat discrimination that "invoke[s] the sweep of congressional authority." [68]

■ Given this broad congressional mandate, it is certainly at least a *plausible* reading of Title II that it covers employment discrimination.[69] This conclusion is bolstered by the Second Circuit's dicta in *Innovative Health Systems* that Title II's anti-discrimination language is a "catch-all phrase that prohibits all discrimination by a public entity, regardless of the context." [70] Indeed, the Second Circuit has applied Title II in employment actions, albeit without discussing the issue presented here.[71]

In *Zimmerman v. Oregon Department of Justice,* the Ninth Circuit suggested another reading:

Congress intended for the second clause [the "or be subjected to discrimination by any such entity" language] to prohibit *intentional* discrimination, whereas it intended for the first clause to prohibit *disparate treatment* of the disabled.... [B]oth clauses prohibit discrimination by a public entity in providing its services, programs, and activities. The clauses differ only in their method of prohibiting discrimination.[72]

The court provided the following example of conduct it thought prohibited under the "first clause" of Title II:

Few would argue that architectural barriers to disabled persons such as stairs, or communication barriers such as the preference for the spoken word, are intentionally discriminatory. Yet stairs can deny the wheelchair-bound access to services provided on the second floor of a government building; and communicating only by the spoken word can deny deaf persons the ability to find out that it is the second floor where they must go to obtain the services they seek.[73]

The "second clause," presumably, would prohibit intentional discrimination such as an explicit policy banning the disabled from the second-floor offices, or the services provided there. Obviously, such a construction would not cover employment discrimination.

The strongest argument advanced by the Authority on behalf of this interpretation is that a construction of Title II that includes employment discrimination would render Title I redundant, at least insofar as it applies to public entities.[74] It is, after

---

66. § 12101(a)(3).

67. § 12101(b)(1).

68. § 12101(b)(4).

69. The Eleventh Circuit, in *Bledsoe,* provided an extensive textual analysis of Title II before reaching the conclusion that it covers employment discrimination. *See* 133 F.3d at 820–22. For brevity's sake, I do not repeat that analysis here.

70. 117 F.3d at 45.

71. *See Castellano v. City of New York,* 142 F.3d 58 (2d Cir.1998).

72. 170 F.3d at 1176 (citations omitted).

73. *Id.* (quoting *Crowder v. Kitagawa,* 81 F.3d 1480 (9th Cir.1996)).

74. The Authority offers several other arguments in support of its position, all drawn from the Ninth Circuit's opinion in *Zimmerman,* 170 F.3d 1169. While I will not recapitulate the compelling counter-arguments ad-

** 174 **

all, a "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant." [75]

This argument is unpersuasive for a number of reasons. *First,* Title II – even on the Authority's reading – is not "entirely" redundant. The two titles overlap only to the extent that they deal with public entities. *Second,* even with respect to public entities, the scope of the two titles is different:

> There are differences in the scope of coverage of employment discrimination under Title I and Title II (Title I covers employers with 15 or more employees, while Title II covers all public employers, regardless of size), the two Titles evolved from different civil rights laws (Title I is modeled on Title VII of the 1964 Civil Rights Act, while Title II is modeled on the Rehabilitation Act and Title VI of the 1964 Civil Rights Act), and there is a difference in the forms of relief (compensatory and punitive damages are available under Title I, but may not be under Title II), and the procedures to be followed (administrative exhaustion is required under Title I but not under Title II). Thus, the provisions of the two Titles are not coextensive; although both apply to employment, neither is redundant. [76]

*Third,* and finally, there is nothing "redundant" about Congress creating overlapping rights, especially in the area of discrimination. [77]

But even assuming that the construction advanced by the Ninth Circuit in *Zimmerman* is a *plausible* reading of Title II, [78] that would render Title II's scope ambiguous. If the meaning of a statute is ambiguous, then a court must use other tools of statutory construction to determine its proper meaning.

### 2. Agency Regulations

As noted, Title II does not contain an extensive definition of the term "discrimination." Rather, Congress delegated to the Attorney General the power to promulgate regulations relevant to Title II. [79] The Attorney General, in turn, has explicitly determined that Title II applies to employment discrimination:

> No qualified individual with a disability shall, on the basis of disability, be subjected to discrimination in employment

vanced by Judge Reinhardt in his dissent to the Ninth Circuit's denial to rehear that case *en banc*, I do agree with them. *See Zimmerman,* 183 F.3d 1161.

**75.** *Kungys v. United States,* 485 U.S. 759, 778, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988).

**76.** *Zimmerman,* 183 F.3d at 1167 (Reinhardt, J., dissenting from denial of rehearing). *See also Bledsoe,* 133 F.3d at 824 & n. 7.

**77.** *See, e.g., North Haven Bd. of Ed. v. Bell,* 456 U.S. 512, 535 n. 26, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) (in holding that Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, covers employment discrimination on the basis of sex, as does Title VII of the Civil Rights Act of 1964, the Court noted, "even if alternative remedies are available and their existence is relevant, ... the Court

repeatedly has recognized that Congress has provided a variety of remedies, at times overlapping, to eradicate employment discrimination.").

**78.** The Ninth Circuit held that this was the *only* plausible reading of Title II, a conclusion that I reject for the reasons set forth herein, and for the reasons explained by the Eleventh Circuit in *Bledsoe.*

**79.** *See* § 12134(a). *See also* H.R. Rep. 101–485(III), at 52 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 475 ("Unlike the other titles in this Act, title II does not list all of the forms of discrimination that the title is intended to prohibit. Thus, the purpose of this section [§ 12134] is to direct the Attorney General to issue regulations setting forth *the forms of discrimination prohibited.*") (emphasis added).

under any service, program, or activity conducted by a public entity.[80]

Under the Supreme Court's decision in *Chevron U.S.A. Inc. v. Natural Resources Council, Inc.*, a court must give "considerable weight" to a regulation unless it is "arbitrary, capricious, or manifestly contrary to the statute."[81] Thus, a court must defer to the executive's construction of Title II unless the "intent of Congress is clear" and the meaning of the statute is unambiguous, for a court may not give effect to a regulation that ignores the "unambiguously expressed intent of Congress."[82] Because I have already determined that the text of Title II is susceptible to two plausible readings, I must adopt the construction of Title II provided by the Attorney General's regulation.

### 3. Legislative History

The legislative history of the ADA also compels the conclusion that Title II covers employment discrimination. The House Judiciary Committee Report, for example, notes that "[t]he Committee intends ... that the *forms of discrimination* prohibited by [Title II] be identical to those set out in the applicable provisions of titles I and III of this legislation...."[83] The Committee went on to say: "The purpose of title II is to continue to break down barriers to the integrated participation of people with disabilities in all aspects of community life. The Committee intends that title II work in the same manner as Section 504 [of the Rehabilitation Act]."[84]

Section 504 of the Rehabilitation Act, in turn, is unquestionably an employment discrimination provision. As the Eleventh Circuit noted in *Bledsoe v. Palm Beach County Soil and Water Conservation District,*

It is significant that Congress intended Title II to work in the same manner as Section 504 of the Rehabilitation Act, because Section 504 was so focused on employment discrimination that Congress enacted subsequent legislation to clarify that Section 504 applied to other forms of discrimination in addition to employment discrimination.[85]

\* \* \* \* \* \*

In conclusion, it appears quite clear that Title II of the ADA covers employment discrimination.

### IV. CONCLUSION

For the reasons just given, the Authority's motions to dismiss are denied. The Unions have stated viable claims for employment discrimination under both Titles I and II of the ADA. The Clerk is directed to close these motions [# 14, # 21]. A conference is scheduled for April 30, 2004, at 4:30 p.m. in Courtroom 15C.

SO ORDERED.

---

**80.** 28 C.F.R. § 35.140(a) (emphasis added).

**81.** 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**82.** *Id.* at 842–43, 104 S.Ct. 2778.

**83.** H.R.Rep. No. 101–485(II), at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367

**84.** 1990 U.S.C.C.A.N. at 472–73.

**85.** *Bledsoe,* 133 F.3d at 821.