Yolanda **HENNY**, Plaintiff,

v.

**NEW YORK STATE, Office of Mental Health, Rockland Psychiatric Center, Niranjana Patel, in her official capacity, Kathy Ramcharitar, in her official capacity, and New York State, Office of the State Comptroller, New York State, Department of Civil Service as a necessary party, Defendants.**

Case No. 08–CV–10981 (KMK).

United States District Court, S.D. New York.

Jan. 30, 2012.

Randy J. Perlmutter, Esq., Kantrowitz Goldhamer & Graifman, P.C., Chestnut Ridge, NY, for Plaintiff.

Joshua Pepper, Esq., New York State Office of the Attorney General, New York, NY, for Defendants.

## OPINION AND ORDER

KENNETH M. KARAS, District Judge:

Plaintiff Yolanda Henny, a former food service worker at the Rockland Psychiatric Center ("RPC"), brings this action against Defendants New York State, Office of Mental Health, Rockland Psychiatric Center; New York State, Office of the State Comptroller; New York State, Department of Civil Service; and two of her former supervisors in their official capacities (collectively "Defendants") asserting disability discrimination claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, *et seq.,* and race discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Plaintiff alleges that Defendants failed to accommodate her disability, Lymphedema, and ultimately terminated her both for her disability and her race (African–American). Defendants have moved for summary judgment on all claims. For the reasons stated herein, Defendants' motion is granted in its entirety.

### I. Background

#### A. Facts

The following facts are drawn from the Parties' Local Rule 56.1 statements, the

depositions of Plaintiff and the two individual Defendants, and exhibits and declarations submitted by the Parties. Plaintiff is an African–American woman who began working at Rockland Psychiatric Center ("RPC") as a food service worker ("FSW") in late March 2006. (Am. Compl. ¶ 10; Decl. of Yolanda Henny ("Henny Decl.") ¶¶ 1–2.) From an early age, Plaintiff has suffered from a chronic condition known as Lymphedema, which causes painful swelling of her left leg. (Henny Decl. ¶¶ 3–4; *id.* Ex. B, at 1; *id.* Ex. C, at 1.) According to Plaintiff, she feels pain and swelling in her leg almost daily, and long periods of standing or walking exacerbate her condition and cause her leg to swell up. (*Id.* ¶¶ 4–5, Ex. C, at 1; Tr. of Deposition of Yolanda Henny ("Henny Tr.") 32.) Plaintiff testified that she is able to stand for up to four hours continuously, but she has difficulty standing or walking for six hours or more without a break; this had affected her at her previous jobs. (Henny Decl. ¶ 8; Henny Tr. 44–46.)

When she began working at RPC, Plaintiff was a so-called probationary employee. (Henny Tr. 32.) Probationary employees work part-time for up to a year or more before they may be hired as full-time employees. (Decl. of Kathleen Ramcharitar in Supp. of Mot. for S.J. ("Ramcharitar Decl.") ¶¶ 4–5.) Defendants' probation policy required probationary employees like Plaintiff to work a 52–week probation period before they could be removed from probation and made a permanent employee. (Tr. of Deposition of Niranjana Patel ("Patel Tr.") 24; Henny Decl. Ex. K, at 1.) A probationary employee "whose conduct or performance is unsatisfactory may be terminated at any time." (Henny Decl. Ex. K, at 3.) The employee is still on probation after he/she completes a "minimum probationary period" (*id.*), which, in Henny's case, was eight weeks, *see* N.Y. Comp.Codes R. & Regs. tit. 4,

§ 4.5(b)(5)(ii). If an employee is absent above a certain number of times, the missed workdays are added to that employee's maximum probationary period. (Henny Decl. Ex. K, at 2; Reply Decl. of Kathleen Ramcharitar in Supp. of Mot. for S.J. ("Ramcharitar Reply Decl.") ¶ 10.)

FSWs employed by Defendants work one of two shifts: a 5:30 A.M. to 2:00 P.M. shift (the "early shift") and a 10:30 A.M. to 7:00 P.M. shift (the "late shift"). (Henny Decl. ¶ 15; Ramcharitar Decl. ¶ 3; Patel Tr. 7.) Part-time employees like Plaintiff worked a 3:00 P.M. to 7:00 P.M. shift, and had opportunities to volunteer to work extra hours during either of the two full-time shifts as well. (Ramcharitar Decl. ¶ 16; Henny Tr. 35.) Plaintiff worked the 3:00– to 7:00 shift when she began at RPC. (Henny Decl. ¶ 15; Ramcharitar Decl. ¶ 6.) During this shift, her job responsibilities included food preparation, food service during the patients' dinner hour, and cleaning up the dining room after the meal was done. (Henny Decl. ¶ 16; *id.* Ex E, at 1.) It is not clear to what extent Plaintiff had an opportunity to sit down during her shift: Plaintiff testified that she had a break while the patients were eating dinner during which she could sit. (Henny Tr. 34.) Regarding breakfast, Niranjana Patel, the head of the Nutrition Department at RPC and a supervisor of the facility's FSWs, testified that those FSWs performing breakfast service during the early shift would return to the kitchen to work on other tasks while the patients were eating. (Patel Tr. 11.)

Plaintiff sought to work extra hours during the early shift because, she said, the duties of the early shift were similar to those of the 3:00-to-7:00 shift. (Henny Decl. ¶ 17.) By contrast, the late shift involved what Plaintiff calls "trayline" duty: FSWs would stand for "hours" in "one spot" preparing food trays for the

patients. (Henny Tr. 104.) According to Plaintiff, most of the tasks involved in trayline duty had to be performed standing up because FSWs were "part of a team process and management would not allow employees to sit." (Henny Decl. ¶ 18.)

In about May 2006, an incident occurred between Plaintiff and a co-worker, Gina Wise, an African–American female FSW who was not a probationary employee. (Henny Decl. ¶¶ 20–21; Tr. of Deposition of Kathleen Ramcharitar ("Ramcharitar Tr.") 19; Decl. of Joshua Pepper in Supp. of Mot. for S.J. ("Pepper Decl.") Ex. 4, at 3.) According to Plaintiff, Wise complained about Plaintiff's job performance to her supervisor and, when confronted by Plaintiff, threatened to "kick somebody's ass." (Henny Decl. ¶ 20.) Wise shouted at Plaintiff in front of other employees. (*Id.*) Soon thereafter, Plaintiff had a meeting with Kathleen Ramcharitar, one of her direct supervisors, about the incident (Ramcharitar did not remember if this meeting occurred). (*Id.* ¶¶ 21–22; Ramcharitar Tr. 22.) The result was that Plaintiff was not allowed to work further extra hours on the early shift "[f]or a while"; Ramcharitar testified that this was to avoid further conflicts between Plaintiff and Wise. (Ramcharitar Tr. 20.)

By this time, Plaintiff had only worked "one or two early shifts." (Henny Tr. 42.) Plaintiff did work extra hours on the late shift fairly frequently between April and November 2006. (Henny Tr. 58–64; Henny Decl. ¶ 24.) The late shift, and in particular trayline duty, required Plaintiff to stand "for long periods of time, as compared to [her] duties on the early shift" which had allowed her to rest in a sitting position. (Henny Decl. ¶ 24.) Thus, Plaintiff says, she turned down further opportunities to work extra hours on the late shift because they would require her to stand. (*Id.*)

In May or June 2006, Plaintiff, who says her condition was deteriorating, approached Ramcharitar and asked whether she could serve her extra hours on the early shift rather than the late one. (Henny Decl. ¶ 25; Henny Tr. 51–53.) Plaintiff showed Ramcharitar her swollen leg and made various requests for accommodation. According to Plaintiff, Ramcharitar refused to allow her to work extra hours during the early shift without providing a reason. (Henny Decl. ¶ 27.) Plaintiff then requested that she be allowed to serve her extra hours during the late shift in the dining room, rather than on trayline duty; according to Plaintiff, Ramcharitar responded that this would show favoritism. (Henny Tr. 52.) Plaintiff then claims that she asked for a stool to sit on while performing trayline duties, or, alternatively, that she be allowed to separate her two scheduled "pass days" (i.e., days off), so that she would not have to work five days straight and have time for her leg to recover. (*Id.* at 52–53; Henny Decl. ¶ 27.)[1] According to Plaintiff, Ramcharitar again refused, stating that a stool would "slow down productivity" and that pass days had to be used consecutively. (Henny Decl. ¶ 27.)

Defendants do not appear to dispute much of Plaintiff's description of this conversation. Ramcharitar, for her part, does not recall Plaintiff asking for the stool or for the ability to separate her two pass days. (Ramcharitar Decl. ¶¶ 39–40.) But, Ramcharitar states, she would have denied such requests if made; "Sitting on a stool would slow down production considerably because a person sitting on a stool could not navigate the tray line so easily and

---

1. When questioned about this conversation at her deposition, Plaintiff did not mention the request for a stool. Plaintiff only discusses this request in her declaration.

quickly as a person standing." (*Id.* ¶ 39.) As to the separate pass days, Ramcharitar explains that because the FSW job is "highly physically demanding" and workers often require "two full days ... to recover physically and mentally" before a new week of work, RPC policy and its union contract "entitles" every employee to two consecutive pass days; deviations for a single employee "would risk reprisals from the union." (*Id.* ¶ 40.) According to Plaintiff's testimony, this conversation was the only instance in which she asked anyone at her job for an accommodation for her Lymphedema. (Henny Tr. 54.) There is no evidence that Plaintiff needed or wanted accommodations to work on the 3:00–to–7:00 shift, her regular shift, and, indeed, Plaintiff testified that she was always able to perform all of her job duties. (*Id.* 24–25; Henny Decl. ¶ 19.)

Plaintiff was absent from work, or arrived at work late, on several occasions. At RPC, each employee's hours are recorded on time sheets. (*See* Henny Decl. Ex. R.) Each probationary employee also gets a monthly probationary report and reviews it with a supervisor. (Reply Decl. of Kathleen Ramcharitar in Supp. of Mot. for S.J. ("Ramcharitar Reply Decl.") ¶ 3.) The following facts are drawn from these documents as well as from Plaintiff's deposition:

*April 2006:* In Plaintiff's second week of work, Plaintiff's mother-in-law passed away the morning of April 6, 2006. (Henny Decl. ¶ 52; *id.* Ex. R, at 1; *id.* Ex. T, at 1.) There is some discrepancy between Plaintiff's declaration and deposition testimony regarding what happened on that day. In her declaration, Plaintiff states that she "went to RPC" and spoke to Ramcharitar, and informed her that she would be out of work April 6th and 7th. (Henny Decl. ¶ 52.) In her deposition, Plaintiff testified that she called RPC on April 6th and spoke to Ramcharitar, who told her it was "okay to take the day off." (Henny Tr. 78.) Plaintiff could not recall the details of the April 6 conversation, and also could not recall whether she informed Ramcharitar in advance that she would be absent the 7th. (*Id.* at 78–79.) Plaintiff then called Ramcharitar again the morning of April 10, explaining that she would be out of work again because the funeral would be held that day. (Henny · Decl. ¶ 52; Henny Tr. 79.) Ramcharitar asked Plaintiff to bring proof that the service was being held when she returned to work, which Plaintiff did. (Henny Tr. 79; Henny Decl. Ex. T.)

On Plaintiff's time sheets, April 6, 7, and 10 are each marked as an "unscheduled absence." (Henny Decl. Ex. R, at 1.)[2] Ramcharitar explains that an absence counts as "scheduled" if it is requested before the end of an employee's last shift prior to the absence, whereas employees who call in the day of their scheduled shift or after to notify RPC are given an "unscheduled" absence. (Ramcharitar Decl. ¶¶ 10–11.) Whether Ramcharitar counts consecutive days missed as a single "absence" or not depends on what the employee told her in advance of the absence. (*Id.* ¶ 12.)

Plaintiff was again absent on April 18, 2006. (Henny Decl. Ex. R, at 2.) Her time sheet describes this absence as a "person[al] problem." (*Id.*) Plaintiff's explanation was that her absence had "something to do with" her mother-in-law's death. (Henny Tr. 73; *see also* Henny Decl. ¶ 56 ("I was absent to attend to some personal issues relating to the death of my mother-

---

2. Plaintiff argues that two of these absences should have been deemed "authorized." (Pl.'s Statement of Material Facts (L. Civ. R. 56.1) ¶ 145.) As a factual matter, Plaintiff's time sheets do not list any of her absences as "unauthorized," only "unscheduled."

in-law.").) Plaintiff testified that she called RPC on April 18 to let her employers know of her absence, but could not recall what was said or to whom she had spoken. (Henny Tr. 73.) Her time sheet does not say she called in, in contrast to other absences. (Henny Decl. Ex. R, at 2.)

Plaintiff's probationary report for the period ending April 30, 2006, did not say anything about her absences and gave Plaintiff a "Satisfactory" grade in the "Time and Attendance" category. (Henny Decl. Ex. S, at 1.)

*May 2006:* Plaintiff claims that she fractured her toe at home on May 3, 2006; she stayed home that day and went to the doctor "the next day." (Henny Decl. ¶ 58.) Plaintiff's time sheets indicate that May 3rd and 4th were pass days; Plaintiff was absent on May 5, 2006. (*Id.* Ex. R, at OMH222; Henny Tr. 73–74.) Plaintiff's medical records do not contain a record of a doctor's office visit until May 11, 2006. (*Id.* Ex. U, at 1–2.) The time sheet indicates that Plaintiff called in to report that she would be absent on May 5th. (*Id.* Ex. R, at OMH222.)

Plaintiff also was forty-five minutes late to work (for a four-hour long shift) on May 14, 2006. (Henny Decl. Ex. R, at OMH221.) Plaintiff did not recall why she was late that day. (Henny Tr. 71.) On May 28, 2006, Plaintiff was in "severe pain" and was unable to go to work. (Henny Decl. ¶ 61; Henny Tr. 72.)[3] She called in sick. (Henny Decl. Ex. R, at OMH221; Henny Decl. ¶ 61.)

Plaintiff received a probationary report for May, which she reviewed and signed May 26, 2006. (Henny Decl. Ex. S, at OMH562.) On this report, Plaintiff received an "Unsatsifactory" rating for "Time and Attendance." The report lists

the dates on which Plaintiff was late or absent, including May 28, 2006, a date that was added by one of Plaintiff's supervisors after the meeting at which Plaintiff signed the report. (*Id.*; Decl. of Ludmila Dvorovenko in Supp. of Mot. for S.J. ¶¶ 5–6.) The report also includes a handwritten comment: "Time and attendance must improve in order to pass probation." Ramcharitar's initials appear next to this note. (Henny Decl. Ex. S, at OMH562.) Plaintiff denies that this comment was present on the report on May 26, 2006, when she signed it. (Henny Decl. ¶¶ 62–63.) She speculates that it was added later, after Defendants decided to terminate her. (*Id.* ¶¶ 63–64.) Ramcharitar denies this, noting that Plaintiff's copy of the probationary report, which she was given at her May 26, 2006 review meeting, contains the comment; Ramcharitar also states that because her signature on the document is dated May 26, 2006, she must have written in the comment on that date. (Ramcharitar Reply Decl. ¶¶ 3–4.)

*June and July 2006:* Plaintiff was one hour late to work (for a four-hour shift) on June 13, 2006. (Henny Tr. 70–71; Henny Decl. ¶ 65; *id.* Ex. R, at OMH220; *id.* Ex. S, at OMH563.) Plaintiff's June probationary report contains a "Satisfactory" rating for "Time and Attendance." (Henny Decl. Ex. S, at OMH563.) Plaintiff's July report, however, indicates that she was absent July 14, 2006, and again states that "Time and attendance must improve in order to pass probation." (*Id.* at OMH560.) There is no other evidence indicating that Plaintiff was absent that day, because Plaintiff's time sheets for the periods between July 5, 2006 and August 2, 2006, and September 28, 2006 and October 25, 2006, are apparently missing. Defendants are unable to explain why Plaintiff's

---

**3.** At her deposition, Plaintiff did not recall why she had to miss work on May 28, 2006.

time sheets are incomplete. (Ramcharitar Reply Decl. ¶ 7 ("I have no knowledge of how these timesheets became lost or misplaced.").) However, Plaintiff does not *deny* that she was absent on July 14. (Henny Decl. ¶ 67 ("I am marked absent on July 14. . . .").) [4]

*August 2006:* Plaintiff's August 2006 probationary report states that she was absent August 2, 11, and 12. (Henny Decl. Ex. S, at OMH228.) The time sheets covering these dates are missing. Plaintiff, by failing to respond to Defendants' requests for admission, has admitted that she was absent on August 2, 2006, a pass day during which Plaintiff had been scheduled to work extra hours but failed to show up. (Pepper Decl. ¶ 5; *id.* Ex. 4, at 2.) *See* Fed.R.Civ.P. 36(a)(3). Plaintiff's own evidence muddies the picture a bit, though she does not explicitly deny the absence. (Henny Tr. 146 ("Q: [ ] But just for the record you said you don't recall why you were absent on August 2, '06, correct? A: Yes, sir, I don't."); Henny Decl. ¶ 69 ("I have no recollection of being asked to work on my pass day nor had I done that previously. My attendance records are missing and there is no proof I was asked to work that day or said I would and did not show up.").)

Plaintiff was absent on August 11th and 12th with strep throat. (Henny Tr. 69–70.) Plaintiff's doctor's note said she could return to work August 13th. (Henny Decl.

Ex. V.) Plaintiff informed Ramcharitar that she would be out sick for these two days, but she did not testify when she did so. (Henny Tr. 69–70.)

On August 7, 2006, Ramcharitar sent Plaintiff a written "counseling" memo "confirm[ing] [a] conversation" about Plaintiff's "time and attendance." (Henny Decl. Ex. W.) In the memo, Ramcharitar accused Plaintiff of having ten unscheduled absences, and warned her that "further incidents may result in failing your probation." (*Id.*) [5] The memo also states that Plaintiff had told Ramcharitar that she was suffering from medical issues, and Ramcharitar told Plaintiff to try to schedule doctor's visits on pass days and to bring in doctor's notes. (*Id.*) Plaintiff signed the memo on August 8, 2006. (*Id.*)

Plaintiff was again given an "Unsatisfactory" grade in the "Time and Attendance" category on her August 2006 probationary report. (Henny Decl. Ex. S, at OMH228.) The report also contains an undated handwritten comment: "Employee was verbally counseled for poor attitude toward coworkers and supervisors and written counseled for time and attendance." (*Id.*) Plaintiff claims this comment was not there when she reviewed and signed the report on September 11, 2006, and, moreover, she denies ever receiving verbal counseling for poor attitude. (Henny Decl. ¶ 72.) [6] Ramcharitar claims that she wrote

---

4. Plaintiff also apparently failed to respond to Defendants' requests for admissions, which were served during discovery in this case. (Pepper Decl. ¶ 5; *id.* Ex. 4.) One of these requests asked Plaintiff to admit that she was absent on July 14, 2006. (*Id.* Ex. 4, at 2.) Plaintiff has therefore technically admitted to this absence for purposes of this motion. *See* Fed.R.Civ.P. 36(a)(3) ("A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney.").

5. It is somewhat unclear how Ramcharitar arrived at the figure of ten unscheduled absences—the record, so far as it has been presented to this Court, documents only eight unscheduled absences before August 7th, the date of Ramcharitar's memo (April 6, 7, 10, and 18; May 5 and 28; July 14; and August 2).

6. Plaintiff admitted at her deposition that she reviewed the probationary report on September 11, 2006 with a supervisor, and denied that she had been verbally counseled for poor attitude. (Henny Tr. 89–90.) Plaintiff point-

the comment on the day she reviewed the report, August 30, 2006, and has produced a handwritten index card documenting, she says, the "verbal counseling" referred to. (Ramcharitar Reply Decl. ¶ 5.) The card states "8.6.06—Verbally counseled for bad attitude toward co workers and supervisors." (*Id.* Ex. 6.)

*September 2006:* On or about September 3, 2006, Plaintiff received oral "counseling" from a supervisor for leaving a lunch cart in a dining room and forgetting to clean the dining room. (Henny Tr. 90; Ramcharitar Reply Decl. Ex. 6.) Plaintiff was half-an-hour late for her four-hour shift on September 10, 2006; she could not explain why at her deposition. (Henny Decl. Ex. R, at OMH218; Henny Tr. 69.) Plaintiff was again rated "Unsatisfactory" in "Time and Attendance" on her September probationary report (she received "Satisfactory" marks in all other categories), but the report contains no comments. (Henny Decl. Ex. S, at OMH227.)

*October and November 2006:* Plaintiff's final probationary report, dated October 30, 2006, states that she "left early" October 24, was absent October 28, and left early again October 29. (Henny Decl. Ex. S, at OMH 239.) What time sheets are in the record confirm these facts as to the latter two dates. (*Id.* Ex. R, at OMH217.)[7] As will be discussed further, Plaintiff moved shifts from the 3:00–to–7:00 shift to the early shift on October 26, 2007. According to Plaintiff, this required her to work seven or eight days consecutively without a pass day, covering the end of her previous shift and the beginning of her new one. As a result, her leg was "in bad shape, swollen and causing [her] significant pain." (Henny Decl. ¶ 81.) On October 27, 2006, Plaintiff fell in the shower and injured her arm. (*Id.*) She was unable to work the next day, October 28th, and, when she reported to work on October 29, 2006, she was limping and her arm was still in pain. (*Id.* ¶ 82.) A supervisor insisted that she stop working and go home, even though, she says, she could have performed her job duties that day. (*Id.*) Both October 28 and October 29 are marked as "unscheduled absence[s]" on Plaintiff's time sheets. (*Id.* Ex. R, at OMH217.)

Plaintiff again was rated "Unsatisfactory" in "Time and Attendance" in her October probationary report, and a supervisor commented on the report that "[t]ime and attendance has not improved since written counseling on 8/8/06." (*Id.* Ex. S, at OMH239.) For the first time in her employment history at RPC, Plaintiff also received "Unsatisfactory" ratings in other areas in which she was evaluated, including "Finished appearance of assignment," "Attitude[ ] toward coworkers," and "Overall Performance." (*Id.*) A supervisor wrote at the bottom of the report that Plaintiff was "verbally counseled for leaving a cart in [dining room] overnight and not cleaning the dining room" on October 8, 2006. (*Id.; see also* Ramcharitar Reply Decl. Ex. 6 (verbal counseling card for Plaintiff).) At her deposition, Plaintiff denied that the counseling ever happened.

ed out that her probationary report contains "Satisfactory" marks in categories relating to her cooperativeness and her relationship with coworkers, patients, and supervisors. (*Id.* at 90; Henny Decl. Ex. S, at OMH228.) Plaintiff did not say that the comment was not on the form when she signed it September 11, 2006 (nor does it appear she was asked about it).

7. There is nothing else in the record discussing what happened on October 24th. Plaintiff states that she "did not miss any time" between September 28 and October 25, a period for which the corresponding time sheets are missing, "nor [does she] believe Defendant contends that I did." (Henny Decl. ¶ 80.)

(Henny Tr. 91.) In her declaration, Plaintiff does not say that the counseling never happened; instead, she alleges that "while that incident did occur," it had happened "several months earlier" and was the "only one related to my performance during my tenure." (Henny Decl. ¶ 85.) Again, Plaintiff alleges that the comment was not on the probationary report when she reviewed it with her supervisors. (*Id.*) Ramcharitar denies this, and states that Plaintiff reviewed the report (with the comment) with her and Patel at the meeting in which Plaintiff was terminated in November 2006. (Henny Tr. 96–97; Ramcharitar Reply Decl. ¶ 6.)

In summer 2006, the need arose for two "replacement" employees to work the early shift temporarily while regular employees were on vacation. (Ramcharitar Decl. ¶ 29.)[8] Ramcharitar asked Lucie Langlois ("Langlois"), an African–American probationary employee, to fill the first spot. (*Id.*) Langlois had specifically requested time on the early shift so she should could work a second job. (*Id.*) For the second spot, Ramcharitar asked Kumari Abraham ("Abraham"), a recently hired Indian–American woman who had volunteered to work additional shifts apart from her probationary shift "whenever possible." (*Id.* ¶ 30; Henny Decl. ¶ 86.) Ramcharitar did not consider Plaintiff sufficiently reliable to work the early shift, given her history of

lateness and unscheduled absences; Ramcharitar explained that it was particularly difficult to find a replacement worker when an FSW is late to the early shift, because the shift begins at 5:30 A.M. (Ramcharitar Decl. ¶¶ 31–32.)

Plaintiff, who had applied unsuccessfully for a permanent position on the early shift in June 2006 (Henny Decl. ¶ 34; *id.* Ex. H), complained to Ramcharitar and Patel that Abraham, who had less seniority than she did, was working the early shift, on which Plaintiff had asked to do extra hours. (Henny Decl. ¶¶ 34, 37; Henny Tr. 112–13.) It appears to be undisputed that at no time during these conversations did Plaintiff say that she felt she was not getting time on the early shift because of either her disability or her race. (Henny Tr. 112–14; Ramcharitar Decl. ¶ 34; Patel Decl. ¶¶ 6–7.)[9] Nevertheless, Plaintiff believes that Patel, an Indian–American, was favoring Abraham, also an Indian–American, over her for time on the early shift. (Henny Decl. ¶ 37.)[10]

On October 4, 2006, Defendants posted an opening for a permanent position on the early shift. (Henny Decl. Ex. J.)[11] Per RPC policy, such positions are awarded to the most senior probationary employee who has expressed interest within two weeks of the position being posted. (Ramcharitar Decl. ¶ 4; Henny Tr. 102.) Plain-

---

8. It is not clear from the record when precisely these vacancies occurred or whether the two replacement employees overlapped in these positions.

9. At oral argument, the Court invited Plaintiff's counsel to submit in writing any evidence in the record that Plaintiff complained she was denied the early shift because of her race. Counsel made no submission.

10. Abraham's time sheets are missing up until late December 2006. (Henny Decl. Ex. G.) Again, there is no explanation for the missing records.

11. Plaintiff alleges that Patel posted this position in response to pressure from "the union." (Henny Decl. ¶ 39.) The Court has not found evidence in the record to support this allegation. Plaintiff also alleges that she had complained to her union about Abraham working the early shift, even though as a probationary worker Plaintiff was not entitled to union protection. The union reportedly said it would "look into the matter." (*Id.* ¶ 35.)

tiff was informed she had been awarded the position on October 19, 2006. (Henny Decl. ¶ 39.) When she began working on the early shift, in late October 2006, she displaced Abraham, who had apparently been working there temporarily. (Id. ¶ 41.) Plaintiff alleges that this made Patel and Ramcharitar "unhappy"; Ramcharitar denies this. (Id.; Ramcharitar Reply Decl. ¶ 8.)

On October 30, 2006, Patel and Ramcharitar had a meeting and decided, based on Plaintiff's record of "excessive absences and tardiness," to recommend her termination. (Patel Decl. ¶¶ 2–3.) After receiving permission from various administrators to fire Plaintiff, Patel met with Plaintiff and told her that she was being terminated. (Henny Tr. 96; Patel Tr. 73.) At this same meeting, Plaintiff reviewed her October probationary report but refused to sign it. (Henny Tr. 96; Henny Decl. Ex. S, at OMH239.) Plaintiff's last work day was November 10, 2006. (Henny Decl. Ex. R, at OMH217.)

### B. Procedural History

Plaintiff (who, at the time, was apparently not represented by counsel) filed a complaint against RPC with the New York State Division of Human Rights on July 11, 2007. (Pepper Decl. Ex. 12.) In it, she claimed that she had been discriminated against because of her disability and her race. Specifically, she claimed that Ramcharitar, despite knowing about Plaintiff's disability, had refused to allow her to work extra hours at times and under conditions that would not exacerbate her condition. (Id. at OMH554–OMH555.) Additionally, she claimed that Patel favored Abraham by awarding her extra time on the "coveted" early shift, in alleged violation of various RPC policies. (Id. at OMH555 (referring to Abraham as "Kamari").) Finally, Defendants had treated Plaintiff's absences differently from those of another Indian–American employee. (Id.)

Plaintiff brought this action on December 17, 2008. (Dkt. No. 1.) Her complaint, as amended, contains claims under Title VII for race discrimination and retaliation (counts 1 and 2) (Second Am. Compl. ¶¶ 64–71), the ADA for discrimination and "harassment and hostile work environment" (counts 3 and 5) (id. ¶¶ 72–74, 79–82), and state law (counts 4 and 6), (id. ¶¶ 75–78, 83–86). The Second Amended Complaint named RPC, two other state agencies, and Patel and Ramcharitar in their official capacities as Defendants. (Dkt. No. 23.) Plaintiff seeks reinstatement "or front pay in lieu thereof" and damages. (Id. at 15–16.) In August 2010, Plaintiff voluntarily withdrew her state law claims, the ADA "harassment and hostile work environment" claim, and all claims against the individual Defendants with prejudice. (Stipulation (Dkt. No. 30).) Thus, the claims that remain are for discrimination under the ADA, race discrimination under Title VII, and retaliation under Title VII. The remaining Defendants moved for summary judgment on all claims in September 2010. (Dkt. No. 33.) The motions were fully submitted in January 2011. The Court held oral argument on November 15, 2011.

### II. Discussion

### A. Standard of Review

Summary judgment may be granted where it is shown "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (same). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all am-

biguities and draw all reasonable inferences against the movant." *Dall. Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir.2003); *see also Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir.2006) (noting that a court must draw all reasonable inferences in the nonmovant's favor).

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir.2005). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir.2008) (internal citations omitted). "When the moving party has carried its burden under Rule 56[ (a) ], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted); *see also McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."). "A fact is 'material' when it might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir.2007) (internal quotation marks omitted). At summary judgment, a court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *See Westinghouse Elec. Corp. v. N.Y.C. Transit Auth.*, 735 F.Supp. 1205, 1212 (S.D.N.Y.

1990). A court's goal should be "to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548.

### B. Analysis

#### 1. ADA Claim

The ADA's first three titles cover discrimination in employment and hiring (Title I), public services, programs, and activities (Title II), and public accommodations (Title III). *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir.2003). Although Plaintiff's Complaint does not specify on which part of ADA her claim is based (Second Am. Compl. ¶ 73), Plaintiff relies on Title II in her motion papers. (Br. of Behalf of Pl. Yolanda Henny in Opp'n to Def. N.Y. State Office of Mental Health, Rockland's Mot. for S.J. ("Pl.'s Mem.") 10–19.) Defendants argue that ADA claims under Title I are barred by New York State's sovereign immunity, as protected by the Eleventh Amendment to the U.S. Constitution, and that any claims Plaintiff may be trying to assert under Title II of the ADA are also barred because Title II, as a statutory matter, does not cover employment discrimination claims. (Def.'s Mem. of Law in Supp. of Mot. for S.J. ("Defs.' Mem.") 8–13.) Defendants also argue that Plaintiff has failed to prove a prima facie case of disability discrimination under the ADA, and that she has not raised sufficient questions of fact on the merits of her ADA claim to overcome the evidence showing that Plaintiff was terminated not for her disability, but for her absences and tardiness. (*Id.* at 14–20.)

 The Eleventh Amendment to the U.S. Constitution provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted

against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. "Although the Amendment, by its terms, bars only federal suits against state governments by citizens of another state or foreign country, it has been interpreted also to bar federal suits against state governments by a state's own citizens...." *Woods v. Rondout Valley Cent. Sch. Dist.*, 466 F.3d 232, 236 (2d Cir.2006) (citing *Hans v. Louisiana*, 134 U.S. 1, 15, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). The Eleventh Amendment applies unless a state affirmatively waives its immunity, *see Lapides v. Bd. of Regents of Univ. of Ga.*, 535 U.S. 613, 618, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002); *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675–76, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999), or if Congress, through a statute passed as a valid exercise of its power under section five of the Fourteenth Amendment, makes "unmistakably clear" in the statute's text its intent to abrogate the states' immunity, *Nev. Dep't of Human Resources v. Hibbs*, 538 U.S. 721, 726, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003). A claim that is barred by a state's sovereign immunity must be dismissed pursuant to the Eleventh Amendment for lack of subject matter jurisdiction. *See Va. Office for Prot. & Advocacy v. Stewart*, — U.S. ——, 131 S.Ct. 1632, 1637, 179 L.Ed.2d 675 (2011) (noting that "the Eleventh Amendment ... confirm[s] the structural understanding that States entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant"); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) ("For over a century [the Supreme Court has] reaffirmed that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.'" (quoting *Hans*, 134 U.S. at 15, 10 S.Ct. 504)).

■ Eleventh Amendment immunity extends not only to a State when sued as a defendant in its own name, but also to "state agents and state instrumentalities" when "the state is the real, substantial party in interest." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997) (internal quotation marks omitted). It is undisputed that the remaining Defendants in this case—RPC and the New York State Office of Mental Health—are agents and instrumentalities of New York State. *See Babcock v. NYS Office of Mental Health*, No. 04–CV–226, 2009 WL 1598796, at *26 (S.D.N.Y. June 8, 2009) (finding the New York State Office of Mental Health to be a state agency and entitled to state immunity); *Lewis v. Krymkevich*, No. 07–CV–4583, 2009 WL 4884093, at *2 (S.D.N.Y. Dec. 17, 2009) (adopting magistrate judge's conclusion that RPC is "an arm of the State of New York entitled to immunity under the Eleventh Amendment").[12]

The Supreme Court has held that Title I of the ADA is not a valid abrogation of the States' sovereign immunity and thus the Eleventh Amendment bars claims brought under Title I against states or state agencies. *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 368–74, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (holding that Congress did not validly abrogate the states' Eleventh Amendment immunity for Title I claims seeking monetary damages); *Melrose v. N.Y. State Dep't of Health Office of Prof'l Med. Conduct*, No. 05–CV–

---

12. The New York State Department of Civil Service and Office of the State Comptroller were dismissed voluntarily from this case on March 25, 2009. (Dkt. No. 8.) The individual Defendants were dismissed, again voluntarily, on August 9, 2010. (Dkt. No. 30.)

8778, 2009 WL 211029, at *5 (S.D.N.Y. Jan. 26, 2009) (dismissing claims brought against state agency for money damages pursuant to Title I of the ADA because such claims were barred by sovereign immunity). This is so for any claims brought under Title I against a State, regardless of the type of relief sought. *See Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 765, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002) ("[S]overeign immunity applies regardless of whether a private plaintiff's suit is for monetary damages or some other type of relief"); *Seminole Tribe*, 517 U.S. at 58, 116 S.Ct. 1114 (noting that the Supreme Court has "often made it clear that the relief sought by a plaintiff suing a State is irrelevant to the question whether the suit is barred by the Eleventh Amendment").[13]

 Plaintiff recognizes the insuperable hurdle posed by the Eleventh Amendment to Title I claims, but argues that her claim is a valid Title II claim, noting that Title II explicitly abrogates States' sovereign immunity. (Pl.'s Mem. 11–12.) *See* 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." (footnote omitted)); *see also Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn*, 280 F.3d 98, 111 (2d Cir.2001) (holding that Title II validly abrogated State sovereign immunity only to the extent that plaintiffs may seek relief for Title II violations "motivated by discriminatory animus or ill will based on the plaintiff[s']

disability"). Defendants respond that Title II's language cannot be interpreted to cover claims involving employment or hiring, which are covered by Title I. (Defs.' Mem. 9–13.)

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from the participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Neither the Supreme Court nor the Second Circuit has decided whether employment discrimination claims may be brought pursuant to Title II. *See Garrett*, 531 U.S. at 360 n. 1, 121 S.Ct. 955 (declining to decide whether employment discrimination claims can be brought pursuant to Title II when the parties did not brief the issue); *Brown v. Connecticut*, 08–CV–1478, 2010 WL 2220580, at *18 (D.Conn. May 27, 2010) ("[D]espite multiple opportunities to clarify the law, the Second Circuit has not yet decided whether claims of discrimination in employment are cognizable under Title II of the ADA."). The two circuit courts that have directly addressed this issue are split. *Compare Zimmerman v. Or. Dep't of Justice*, 170 F.3d 1169, 1173 (9th Cir.1999) (holding that Title II is not applicable to employment discrimination), *with Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist.*, 133 F.3d 816, 820 (11th Cir. 1998) (concluding that employment discrimination claims can be brought pursuant to Title II).[14] Similarly, the district

---

**13.** The *Ex Parte Young* exception to a State's sovereign immunity is inapplicable here. *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), permits suits for prospective injunctive relief against state officers in their official capacities to remedy ongoing violations of federal law. *See also Garrett*, 531 U.S. at 374 n. 9, 121 S.Ct. 955 (noting

that Title I of the ADA can be enforced "by private individuals in actions for injunctive relief under *Ex parte Young* "). As mentioned earlier, Plaintiff has dismissed all claims she had or may have brought against Ramcharitar and Patel with prejudice. (Dkt. No. 30.)

**14.** The Fourth and Fifth Circuits have assumed Title II employment discrimination

courts within the Second Circuit are divided on the issue. *Compare, e.g., Gallagher v. Town of Fairfield,* No. 10–CV–1270, 2011 WL 3563160, at \*2–3 (D.Conn. Aug. 15, 2011) (holding that Title II does not cover employment discrimination claims); *Reddick v. S. Conn. State Univ.,* No. 10–CV–1118, 2011 WL 1833288, at \*2–3 (D.Conn. May 12, 2011) (construing an employment discrimination claim to be brought under Title I, on the assumption that Title II does not cover such claims); *Emmons v. City Univ. of N.Y.,* 715 F.Supp.2d 394, 408 (E.D.N.Y.2010) (holding "that Title I is the *exclusive* remedy for employment discrimination claims" (emphasis in original)); *Melrose,* 2009 WL 211029, at \*9 (finding that the plaintiff's employment discrimination claims could not be brought pursuant to Title II); *Fleming v. State Univ. of N.Y.,* 502 F.Supp.2d 324, 333–34 (E.D.N.Y.2007) (same), *with Transp. Workers Union of Am., Local 100 v. N.Y.C. Transit Auth.,* 342 F.Supp.2d 160, 175 (S.D.N.Y.2004) (holding that Title II could be used for employment discrimination claims); *Winokur v. Office of Court Admin.,* 190 F.Supp.2d 444, 449 (E.D.N.Y.2002) (same).

■ "When interpreting the terms of a statute, the court 'generally look[s] first to the plain language ... and interpret[s] it by its ordinary, common meaning.'" *Cormier v. City of Meriden,* No. 03–CV–1819, 2004 WL 2377079, at \*2 (D.Conn. Sept. 30, 2004) (alterations and omissions in original) (quoting *Luyando v. Grinker,* 8 F.3d 948, 951 (2d Cir.1993)); *see also Carcieri v. Salazar,* 555 U.S. 379, 387–88, 129 S.Ct. 1058, 172 L.Ed.2d 791 (2009) (noting that under "settled principles of statutory construction[,] ... [courts] must first determine whether the statutory text is plain and unambiguous," and "[i]f it is, [courts] must apply the statute according to its terms"). The Court agrees with the Ninth Circuit's reasoning that the plain or common meaning of the phrase "the services, programs, or activities of a public entity" is the programs or activities offered to the public by the agency, as opposed to the internal administration or workings of the agency. *See Zimmerman,* 170 F.3d at 1174 (noting that "[a] common understanding of [the phrase 'services, programs, or activities'] shows that it applies only to the 'outputs' of a public agency, not to 'inputs' such as employment"); *see also Cormier,* 2004 WL 2377079, at \*2–\*3 (same). In other words, the phrase "services, programs, or activities" most logically refers to such things as the provision of medical services by a public hospital, the facilities of a public park, or social services provided by a public agency, not to employment at the public agency. *See Cormier,* 2004 WL 2377079, at \*3 (noting, in dismissing plain-

claims apply to public entities without explicitly analyzing the issue. *See Holmes v. Tex. A & M Univ.,* 145 F.3d 681, 683–84 (5th Cir. 1998); *Doe v. Univ. of Md. Med. Sys. Corp.,* 50 F.3d 1261, 1264–67 (4th Cir.1995). The Tenth Circuit has ruled that the question is not a matter of subject matter jurisdiction, but "expressly decline[d] to decide whether Title II covers employment discrimination." *Davoll v. Webb,* 194 F.3d 1116, 1128–30 (10th Cir.1999). The Sixth Circuit observed in a case relating to Title III of the ADA, which prohibits discrimination in public accommodations, that "the statutory framework of the ADA expressly limits discrimination in employment practices to Title I of the ADA." *Parker v. Metro. Life Ins. Co.,* 121 F.3d 1006, 1014 (6th Cir.1997). But that court recently treated the question as open in that Circuit, as has the First Circuit. *See Whitfield v. Tennessee,* 639 F.3d 253, 257–58 (6th Cir.2011); *Sepulveda–Villarini v. Dep't of Educ.,* 628 F.3d 25, 28 (1st Cir.2010) (declining to decide whether Title II covers employment discrimination claims because the issue was not raised adequately on appeal); *Carmona–Rivera v. Puerto Rico,* 464 F.3d 14, 17 (1st Cir. 2006) (assuming claim is viable under Title II but affirming dismissal because plaintiff claimed no damages that were recoverable).

tiff's claims regarding employment discrimination at a fire department, that the fire department would "describe the 'services, programs, and activities' it[ ][ ] provides as taking emergency telephone calls, dispatching fire and emergency personnel, putting out fires, and otherwise protecting public safety," not as "hiring its employees"); *Filush v. Town of Weston,* 266 F.Supp.2d 322, 328 (D.Conn.2003) ("If asked what services, programs, and activities it provided, [a] [t]own might respond that it provided basic municipal services such as public education, public transportation, or law enforcement. It would not answer that it hired teachers, bus drivers, and police officers.").[15]

The second clause of Title II's prohibition against disability discrimination states that no qualified individual "shall ... be subjected to discrimination" on account of his disability by a public entity. 42 U.S.C. § 12132. In *Bledsoe,* the Eleventh Circuit seized upon this broader language, holding that Title II applies to employment discrimination in part because the second clause "is not tied directly to the 'services, programs, or activities' of the public enti-

ty." 133 F.3d at 821–22; *see also Filush,* 266 F.Supp.2d at 328 (noting that "[s]ome courts have held that the second clause is independent from the first and that it prohibits *any* form of discrimination by a public entity" (emphasis in original)). However, as the Ninth Circuit noted in *Zimmerman,* Title II links the second clause to the first clause by placing them together in a single sentence and by defining a "qualified individual" to mean "an individual with a disability who ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2); *see also Zimmerman,* 170 F.3d at 1175–76 (noting that "the second clause ... must relate to a government service, program, or activity; otherwise a plaintiff is not 'qualified' to bring a claim"); *Filush,* 266 F.Supp.2d at 329 (noting that the second clause "appears to relate back to the same services, programs, and activities of a public entity that the first clause covers" (alterations and internal quotation marks omitted)).[16]

---

**15.** In *Tennessee v. Lane,* the Supreme Court commented that Congress enacted Title II to address disparate treatment in the provision of public services, such as education, mental health treatment, marriage, and the like. 541 U.S. 509, 524–25, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004). No mention was made of any activity akin to employment by public entities.

**16.** The Court notes that several courts have pointed to language in the Second Circuit's decision in *Innovative Health Systems, Inc. v. City of White Plains,* 117 F.3d 37 (2d Cir. 1997), in holding that the second clause of Title II's definition of discrimination is broad enough to encompass employment discrimination. *See, e.g., Bledsoe,* 133 F.3d at 822; *Winokur,* 190 F.Supp.2d at 449. In *Innovative Health,* the Second Circuit stated that Title II's anti-discrimination provision was not limited to "conduct that occurs in the 'programs, services, or activities'" of a public

entity because "a catch-all phrase [ ] prohibits all discrimination by a public entity, regardless of the context." 117 F.3d at 44–45. However, *Innovative Health* analyzed whether zoning regulations could fit within the anti-discrimination provision of Title II and had nothing to do with employment discrimination. *Id.* at 44. As a result, when read in context, *Innovative Health* is easily distinguishable from the instant matter. *See Fleming,* 502 F.Supp.2d at 329 n. 2 (noting that *Innovative Health* did not "answer the question whether Title II covers employment discrimination" and cautioning "against overreading the Second Circuit's use of the term 'catch-all phrase'"); *Syken v. New York,* No. 02–CV–4673, 2003 WL 1787250, at *11 (S.D.N.Y. Apr. 2, 2003) (noting that *Innovative Health* was distinguishable from cases involving employment discrimination and was issued before the Supreme Court's decision in *Garrett*). Moreover, since *Innovative Health,* the question of Title II's coverage of employ-

Even if the plain meaning of the text was ambiguous, the overall structure and specific provisions of the ADA further support the argument that Congress did not intend for Title II to encompass employment discrimination. Regarding the overall structure, the Supreme Court noted in *Tennessee v. Lane* that the ADA covers "three major areas of public life: employment, which is covered by Title I ...; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III." 541 U.S. 509, 516–17, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004); *see also Cormier*, 2004 WL 2377079, at *6 (noting that the Supreme Court's language from *Lane* offers a "fairly strong indication that the Supreme Court would not consider Title II to be the appropriate statutory vehicle for employment cases"). More specifically, Title I "is entitled 'Employment' and expressly covers claims for employment discrimination," *Syken v. New York*, No. 02–CV–4673, 2003 WL 1787250, at *7 n. 9 (S.D.N.Y. Apr. 2, 2003). In contrast, Title II is entitled "Public Services" and contains no provisions expressly covering employment discrimination. *See Melrose*, 2009 WL 211029, at *9 (noting difference between titles and provisions of Title I and Title II); *Filush*, 266 F.Supp.2d at 329 (noting that the legislative heading for "Title II, 'Public Services,' suggests that it was intended to pertain only to the provision of public services"). Moreover, as explained, the definition of qualified individual in Title I "refers to a person's qualifications to work and be employed," but the definition of qualified individual in Title II "refers to a person who is eligible to receive services or participate in programs or activities provided by a public

entity." *Filush*, 266 F.Supp.2d at 330; *see also Syken*, 2003 WL 1787250, at *8 (noting that "Title I specifically defines 'qualified individual with a disability' in terms of employment," but Title II's definition of that same term "has nothing to do with employment"). Indeed, the Supreme Court has questioned whether "Title II of the ADA, dealing with the 'services, programs, or activities of a public entity,' is available for claims of employment discrimination when Title I of the ADA expressly deals with that subject," noting that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Garrett*, 531 U.S. at 360 n. 1, 121 S.Ct. 955 (citations and internal quotation marks omitted).

Importantly, as many courts have pointed out, reading Title II to encompass employment discrimination would eviscerate many of the specific limits placed on employment discrimination claims by Title I. For example, "[u]nlike Title I, Title II does not require a plaintiff to exhaust his administrative remedies prior to filing suit." *Syken*, 2003 WL 1787250, at *9. As a result, allowing employment discrimination claims under Title II would allow all employees of public entities to bypass the administrative exhaustion process and file suit directly in federal court. *See id.; see also Filush*, 266 F.Supp.2d at 330 (noting the impractical result of allowing public employees to "circumvent the administrative procedures required under Title I"). Furthermore, unlike Title I, which limits actionable employment discrimination to claims against employers (including public

ment discrimination has been an open question within the Second Circuit. *See, e.g., Mary Jo C. v. New York State and Local Retirement System*, No. 09–CV–5635, 2011 WL 1748572, at *11 (E.D.N.Y. May 5, 2011) (noting that "the Second Circuit has not expressly considered this issue").

entities) with fifteen or more employees, Title II would allow claims against public entities regardless of the number of employees. *See Syken,* 2003 WL 1787250, at *9 (noting the redundancy of allowing public employees of an agency with more than fifteen employees to sue under either Title I or Title II). Moreover, Title I sets out a specific affirmative defense against claims of employment discrimination based on the application of a test or criteria that denies a qualified individual "a job or benefit" if the test or criteria is "shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation."

42 U.S.C. § 12113. Because Title II contains no similar provision, public employers might not be able to avail themselves of this defense if plaintiffs bring employment discrimination claims under Title II. Additionally, because the ADA charges the EEOC with enforcing Title I and the Department of Justice ("DOJ") with enforcing Title II, allowing employment discrimination claims to be brought under either title creates the potential for conflicting regulations on the same subject. *See Fleming,* 502 F.Supp.2d at 331 (noting that "Congress [ ] charged different agencies with implementing Title I (EEOC) and II (DOJ)").[17]

**17.** Most courts finding that Title II covers employment discrimination have relied heavily on the legislative history of the ADA. Specifically, courts have relied on a Report from the United States House of Representatives Judiciary Committee, which states that "in the area of employment, title II incorporates the duty set forth in the regulations for Sections 501, 503 and 504 of the Rehabilitation Act to provide a 'reasonable accommodation' that does not constitute an 'undue hardship,'" *Bledsoe,* 133 F.3d at 821 (quoting H.R.Rep. No. 101–485(III), at 50 (1990), 1990 U.S.C.C.A.N. 445, 473), and that the Committee intended that the "forms of discrimination prohibited by [Title II] be identical to those set out in" Titles I and III. *Id.* (quoting H.R. Rep. No. 101–485(II), at 84 (1990), 1990 U.S.C.C.A.N. 303, 367); *see also Transp. Workers Union,* 342 F.Supp.2d at 175. First, because the Court finds the text and structure of the ADA unambiguous, this legislative history carries little, if any, weight. *See Fleming,* 502 F.Supp.2d at 333 (noting that the legislative history carried "no weight" when the language of the statute was clear and unambiguous); *Filush,* 266 F.Supp.2d at 331 n. 4 (declining to consider statements in the ADA's legislative history "because the plain language of the statute is unambiguous"); *see generally Dep't of Hous. & Urban Dev. v. Rucker,* 535 U.S. 125, 132, 122 S.Ct. 1230, 152 L.Ed.2d 258 (2002) ("[R]eference to legislative history is inappropriate when the text of a statute is unambiguous."). Second, this legislative history is contradicted by the Rehabilitation Act's own invocation of Title I in rela-

tion to employment discrimination claims. Specifically, the Rehabilitation Act provides that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination ... shall be the *standards applied under title I* of the [ADA]." 29 U.S.C. § 794(d) (emphasis added). In other words, although the House Committee Report links employment discrimination claims brought under the Rehabilitation Act with Title II of the ADA, the Rehabilitation Act itself links such employment discrimination claims with Title I. *See Syken,* 2003 WL 1787250, at *9 (noting that the Rehabilitation Act incorporates the standards of ADA Title I in relation to employment discrimination claims); *see also Zimmerman,* 170 F.3d at 1178 (noting that in order to avoid conflicting agency regulations on employment discrimination claims, "Congress ordered the agencies charged with enforcing Title I (the EEOC) and the Rehabilitation Act of 1973 (the Attorney General)" to develop procedures ensuring that claims are "dealt with in a manner that avoids duplication of effort and prevents imposition of inconsistent or conflicting standards").

Similarly, the Court notes that § 504 of the Rehabilitation Act prohibits discrimination against qualified individuals "under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Although this rather broad provision is understood to include employment discrimination, *see Consol. Rail Corp. v. Darrone,* 465 U.S. 624, 632, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984) (noting

■ Thus, based on the plain meaning of the text and the structure of the statute, the Court finds that Title II of the ADA does not cover employment discrimination claims. Accordingly, Plaintiff cannot bring her employment discrimination claim pursuant to Title II, and, therefore, summary judgment on this claim must be awarded in Defendants' favor. Because Plaintiff's claims are barred on statutory grounds, the Court need not address the potentially complicated constitutional question of whether Congress validly abrogated the states' sovereign immunity for Title II employment discrimination claims. *See Fleming,* 502 F.Supp.2d at 334 (declining to decide whether the Eleventh Amendment barred the plaintiff's Title II employment discrimination claims after dismissing the claims on statutory grounds, noting that plaintiffs should not be permitted to "circumvent *Garrett's* holding that Title I's prohibition on disability-based employment discrimination does not apply to state employers" by pleading Title II claims);

*Sworn v. W. N.Y. Children's Psychiatric Ctr.,* 269 F.Supp.2d 152, 157–58 (W.D.N.Y. 2003) (same).[18] The Court also need not address, and expresses no view about, whether Plaintiff has produced enough evidence on the merits of her disability discrimination claim to go to a jury had the claim not been barred.

### 2. Title VII Claims

#### a. Race Discrimination

■ It is well established that race discrimination claims under Title VII should be analyzed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g., Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010); *Liburd v. Bronx Lebanon Hosp. Ctr.,* No. 07–CV–11316, 2009 WL 900739, at *3 (S.D.N.Y. Apr. 3, 2009).[19] Under *McDonnell Douglas,* "the plaintiff bears the initial burden of establishing a prima facie case

**18.** that "it is unquestionable that the [any program or activity section] was intended to reach employment discrimination"); *see also Bynum v. N.Y.C. Transit Auth.,* No. 01–CV–7945, 2007 WL 1458196, at *2 (E.D.N.Y. May 16, 2007) (analyzing employment discrimination claims brought against New York City agency under Section 504 of the Rehabilitation Act), the Rehabilitation Act does not include the explicit separation of employment discrimination claims from claims related to public services that is part of the ADA. Moreover, in contrast to Title I of the ADA, the Rehabilitation Act does not require any plaintiffs to exhaust administrative remedies prior to filing suit pursuant to Section 504. In sum, the structure and detailed requirements set out in the ADA differentiate the broad language of Title II from the somewhat similar language used in the Rehabilitation Act.

**18.** It bears noting that in *Lane,* while finding that Congress had validly abrogated sovereign immunity for Title II claims relating to access to judicial proceedings, the Supreme Court re-emphasized its holding in *Garrett* that "nei-

ther the ADA's legislative findings nor its legislative history reflected a concern that the States had been engaging in a pattern of unconstitutional employment discrimination." 541 U.S. at 521–22, 124 S.Ct. 1978; *see also Garrett,* 531 U.S. at 372, 121 S.Ct. 955 ("Congress' failure to mention States in its legislative findings addressing discrimination in employment reflects that body's judgment that no pattern of unconstitutional state action had been documented."); *Castells v. Fisher,* No. 05–CV–4866, 2007 WL 1100850, at *5 (E.D.N.Y. Mar. 24, 2007) (finding that Congress had not validly abrogated sovereign immunity for Title II employment discrimination claims, noting that "the ADA's legislative record fails to show that Congress identified a history and pattern of irrational employment discrimination by the States against the disabled").

**19.** New York does not enjoy immunity from Title VII claims. *See Hibbs,* 538 U.S. at 729–30, 123 S.Ct. 1972 (citing *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)).

of discrimination [under Title VII]. If the plaintiff does so, the burden shifts to the defendant to articulate 'some legitimate, non-discriminatory reason' for its action. If such a reason is provided, the plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of racial discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir.2008) (citation omitted) (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817); *see also Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466–67 (2d Cir.2001) (same). To do so, a plaintiff "must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000) (alterations and internal quotation marks omitted). "To get to the jury, 'it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.'" *Id.* (alterations omitted) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

▄ To satisfy her burden of establishing a prima facie case of discrimination, a plaintiff must produce evidence that shows that: (1) she belongs to a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances surrounding the adverse employment action give rise to an inference of discrimination. *See Holcomb*, 521 F.3d at 138; *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir.2001).

In their opening memorandum, Defendants concede for purposes of this motion that the first three elements are satisfied in this case. (Defs.' Mem. 21.) It is certainly not disputed that Henny is African-American and was qualified for her job. As for the required adverse employment action, Defendants apparently assumed that Plaintiff was relying on her termination. (*See id.*) In the three pages in her submission she devotes to the race discrimination claim, Plaintiff makes her theory somewhat unclear. She argues that Defendants placed Abraham, an Indian-American, on the early shift, while denying Plaintiff "access" to that shift for extra hours purposes; then, after Plaintiff complained and Defendants were "forced" to post an opening for a permanent position, which Plaintiff bid on and was awarded, Defendants fired Plaintiff and placed Abraham back in her old position on the early shift. (Pl.'s Mem. 21–22; *see also* Henny Decl. ¶ 87 (alleging that "upon my termination, Abraham was returned to her original spot on the Early Shift, taking over the spot I had only recently won. Clearly, Patel wanted Abraham to have that shift.").) Thus, it is not clear whether Plaintiff thinks that, apart from her termination, her exclusion from the early shift in favor of Abraham also constituted an adverse employment action. In their reply, Defendants read Plaintiff's submission as "abandon[ing]" her claim that her termination was based on race, but continue to concede that Plaintiff has shown that she suffered an adverse employment action. (Defs.' Reply 11.)

▄ Giving Plaintiff the benefit of the doubt and assuming that she is arguing that both her exclusion from the early shift in favor of Abraham and her termination were adverse employment actions motivated by her race, the Court is somewhat perplexed at Defendants' concession that

the former constitutes an adverse employment action. *See Edwards v. MetroNorth Commuter R.R. Co.*, No. 04–CV–1430, 2006 WL 2790402, at *5 (D.Conn. Sept. 27, 2006) ("Consideration of the . . . existence of an adverse employment action[ ] requires isolation of the specific actions claimed by the plaintiff.").[20] Still, the Plaintiff had other opportunities to work extra time, her exclusion from the early shift arguably is not *materially* adverse. *See Allen v. St. Cabrini Nursing Home, Inc.*, 198 F.Supp.2d 442, 449 (S.D.N.Y.2002) (denial of opportunity to work one day's worth of overtime not an adverse employment action where plaintiff had other opportunities to earn overtime pay); *see also Pettit v. Steppingstone Ctr. for the Potentially Gifted*, No. 08–CV–12205, 2009 WL 2849127, at *12–13 (E.D.Mich. Sept. 1, 2009) (employment contract limiting plaintiff to certain number of hours per week, unless authorized by supervisor, was not a materially adverse employment action because there was no evidence supervisor refused a request to work additional hours, and there was no burden to plaintiff to seek permission to do so). And, of course, "[c]ourts in this [C]ircuit have held that an unfavorable work schedule does not constitute an adverse employment action." *Zhao v. Time, Inc.*, No. 08–CV–8872, 2010 WL 3377498, at *12 (S.D.N.Y. Aug. 24, 2010).

At best, Defendants' failure to give Plaintiff the early shift position could be characterized as analogous to a failure to promote her to a job to which she was entitled over Abraham. Plaintiff argues that the position should have been posted and awarded to the bidder with highest seniority pursuant to RPC policy (Henny Decl. ¶ 32–33), but Ramcharitar asserts that the position, when Abraham was asked to fill it, was temporary, as it was a replacement for "people [who] were taking vacations during the summer." (Ramcharitar Decl. ¶ 30.) It is undisputed, however, that Abraham worked in this "temporary" position for about two months until Plaintiff was awarded it as a full-time employee through the bidding process, so there is at least some basis to question Ramcharitar's explanation. The flaw in this argument for Plaintiff, however, is that she produces no evidence suggesting that *she would have received* the position had it been posted in July 2006—i.e., that she would have been the senior bidder. (She was the senior bidder when it finally was posted, in October 2006.) Thus, there is reason to question whether Plaintiff can show that the appointment of Abraham was a materially adverse change in Plaintiff's employment.

**20.** "An adverse employment action is a materially adverse *change* in the terms and conditions of employment." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir.2008) (internal quotation marks omitted) (emphasis omitted). To constitute a "materially adverse change," there must be "a change in working conditions . . . [that is] more disruptive than mere inconvenience or an alteration of job responsibilities." *Id.* Employment actions include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir.2006) ("Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." (internal quotation marks omitted)).

"[T]here is no question that . . . termination is an adverse employment action." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir.2006). Less clear is whether the failure of Defendants to allow Plaintiff to work her extra hours on the early shift in favor of Abraham, while continuing to allow her to work significant extra time (and thus earn more money) on the late shift is an adverse employment action under Title VII. First, Plaintiff suffered no "materially adverse *change*" in her employment conditions, as her *regular* assignment to the 3:00–to–7:00 shift was a constant until October 2006. The only "change" that occurred with respect to when Plaintiff could work her *extra, voluntary* hours appears to have happened before Abraham was even hired by RPC in July 2006 (Henny Decl. ¶ 31); Plaintiff was not permitted to work early shift hours beginning in May 2006, after working only one or two such shifts, because of an incident between her and a co-worker (Gina Wise). (Pl.'s 56.1 ¶¶ 99–103; Henny Tr. 38–40, 42.) Second, Plaintiff was not denied the ability to work extra hours, simply the ability to work them during a time that she preferred. In light of the fact that

Court will assume for purposes of this motion that both can be adverse employment actions.

The Second Circuit has not created an "unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir.1996). A Plaintiff may satisfy this element of the prima facie case by showing direct evidence of discriminatory animus, such as "remarks made by decisionmakers that could be viewed as reflecting [such] animus." *Id.* Alternatively, "[a] plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir.1999); *see also Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir.2003) ("A showing of disparate treatment—that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir.2000))).

Conclusory and speculative allegations will not suffice to demonstrate discriminatory intent. Rather, Plaintiff "must point to facts that suggest" that the adverse action was motivated, at least in part, by discriminatory animus. *Kalsi v. N.Y.C. Transit Auth.*, 62 F.Supp.2d 745, 753 (E.D.N.Y.1998), *aff'd*, 189 F.3d 461 (2d Cir.1999); *see also Anderson v. Port Auth. of N.Y. & N.J.*, No. 04–CV–4331, 2009 WL 102211, at *4 (S.D.N.Y. Jan. 12, 2009)

("[M]ere conclusory allegations of discrimination will not defeat a summary judgment motion; a plaintiff in a discrimination case must proffer 'concrete particulars' to substantiate his claim."); *Whaley v. City Univ. of N.Y.*, 555 F.Supp.2d 381, 399 (S.D.N.Y.2008) (finding no inference of discrimination because Plaintiff presented no evidence supporting discriminatory animus). "Although the burden of meeting the prima facie case is 'de minimis,' Plaintiff must adduce some admissible evidence that would support [his] claims." *Hill v. Rayboy–Brauestein*, 467 F.Supp.2d 336, 356 (S.D.N.Y.2006).

As to Defendants' alleged denial of Plaintiff's opportunity to work the early shift, Plaintiff does not point to any direct evidence of discriminatory animus and instead relies entirely on the decision of Patel, one of her supervisors who is Indian–American, to give Abraham the extra hours on the early shift.[21] (Pl.'s Mem. 21–22.) Similarly, as to her termination, Plaintiff asserts that when she was finally awarded the early shift position in October 2006, Defendants fired her soon thereafter and reinstated Abraham to the position. (*Id.* at 22.) Plaintiff and Abraham were both probationary employees; Abraham had less seniority than Plaintiff, and, at least on Plaintiff's view of the facts, both had asked for work on the early shift. (Ramcharitar Decl. ¶ 30; Henny Decl. ¶¶ 34, 86.) In light of the minimal burden Plaintiff bears to establish a prima facie case, the Court agrees that this evidence, viewed in Plaintiff's favor, does establish a prima facie case of race discrimination. *See D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193, 195 (2d Cir.2007) (holding that inference of age discrimination was shown where plaintiff was passed over for

---

21. Patel is Indian–American (Patel Tr. 5) but at oral argument, Plaintiff's counsel conceded that Ramcharitar is not.

hiring in favor of two others, one of whom had a "significant enough" difference in age from the plaintiff); *de la Cruz v. N.Y.C. Human Resources Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 20 (2d Cir.1996) (noting that prima facie case of discrimination may be demonstrated by showing that the plaintiff "was replaced by someone not a member of his protected class"); *Artope v. Ctr. for Animal Care & Control, Inc.*, No. 05–CV–9283, 2009 WL 874037, at *9 (S.D.N.Y. Mar. 27, 2009) ("Replacement by someone outside the plaintiff's protected category is a circumstance that gives rise to an inference of discrimination."); *Gibson v. Naugatuck Hous. Auth.*, No. 04–CV–1616, 2007 WL 2572265, at *4 (D.Conn. Sept. 5, 2007) (noting that "more favorable treatment of a similarly situated coworker by a supervisor of the same race will frequently support a prima facie case of race discrimination," but finding that there was no evidence the similarly situated employee had been treated favorably).[22]

■ Defendants point to Plaintiff's "excessive absences and tardiness" as their legitimate, non-discriminatory reason for terminating Plaintiff. (Defs.' Mem. 22.) Similarly, Ramcharitar explains that she did not consider asking Plaintiff to fill the temporary position occupied by Abraham because Plaintiff had already been late or absent several times by that point and Ramcharitar did not consider her "sufficiently reliable." (Ramcharitar Decl. ¶ 32.) Obtaining a replacement for an early-shift FSW at short notice "require[d] calling another employee at 5:30 a.m. or earlier and waking him or her up ... to make the extra-time request." (*Id.* ¶ 31.) The record does reflect that by summer 2006, when the need arose for extra help on the early shift, Plaintiff had indeed been absent four times in April and two times in May, and had been late twice (once in May, once in June). Plaintiff's lateness and absences certainly suffice to establish a legitimate, non-discriminatory reason for her treatment. *See Kanhoye v. Altana Inc.*, 686 F.Supp.2d 199, 209 (E.D.N.Y. 2009) (holding that "minimal burden" to establish legitimate, nondiscriminatory reason was satisfied where plaintiff received "below expectations" ratings in the "lateness" category on job performance reviews); *Edwards v. Elmhurst Hosp. Ctr.*, No. 07–CV2452, 2009 WL 6683365, at *7 (E.D.N.Y. Sept. 17, 2009) (concluding that plaintiff's "excessive absences and lateness" constituted a legitimate, non-discriminatory reason for changing plaintiff's employment status); *Ebanks v. Neiman Marcus Grp., Inc.*, 414 F.Supp.2d 320, 337 (S.D.N.Y.2006) (holding that plaintiffs' lateness and frequent absences were legiti-

---

**22.** It bears noting, however, that Plaintiff completely ignores the undisputed fact that before placing Abraham on the early shift, Defendants asked Langlois, an African–American woman, to work the same shift. (Statement of Material Facts (L. CIV. R. 56.1) ("Pl.'s 56.1") ¶ 51; Defs.' Statement of Material Facts Pursuant to Local Rule 56.1 ("Defs.' 56.1") ¶ 51.) While it is true as a general matter that "discrimination against one employee cannot be cured, or disproven, solely by favorable, or equitable, treatment of other employees of the same race or sex," *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir.2001), Langlois's appointment certainly weakens any inference that can be drawn from the facts presented here that Plaintiff's supervisors were motivated by discriminatory animus against African–Americans in their treatment of Plaintiff. *See, e.g., Aiello v. Stamford Hosp.*, No. 09–CV–1161, 2011 WL 3439459, at *17 (D.Conn. Aug. 8, 2011) (noting that "the fact that [defendant] hired a male to replace [the male plaintiff] also undermines a finding that the circumstances surrounding [the adverse employment actions] gave rise to an inference of gender discrimination," but assuming that the evidence still established a prima facie case). Plaintiff also does not dispute that, overall, African and Indian–American FSWs work similar numbers of extra hours at RPC. (Ramcharitar Decl. ¶¶ 35, 37.)

mate, nondiscriminatory reason for their termination).

 Having proffered a legitimate, non-discriminatory reason for Plaintiff's exclusion from the early shift and her termination, the presumption of discrimination created by Plaintiff's showing of a prima facie case "drops out of the picture." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir.2000) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 510–11, 113 S.Ct. 2742). Defendants are therefore "entitled to summary judgment … unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Id.; see also Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir.2005) (same). Plaintiff must produce sufficient evidence from which a rational jury could conclude that "the defendant was in fact motivated at least in part by the prohibited discriminatory animus." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010). A plaintiff may, but need not, attempt to prove that the employer's legitimate, non-discriminatory explanation is dishonest, *see id.*, but, if a plaintiff does attempt to do so, she may not rely solely on rebutting the employer's explanation; the plaintiff must show that the employer's reason was "*both* … false, *and* that discrimination was the real reason." *Isaac v. City of New York*, 701 F.Supp.2d 477, 488 (S.D.N.Y.2010) (emphasis in original) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515, 113 S.Ct. 2742); *see also Weinstock*, 224 F.3d at 42 ("To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination" (alterations and internal quotation marks omitted) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519, 113 S.Ct. 2742)).

Plaintiff quibbles a great deal with how Defendants characterized certain absences on her employment records and with the contents of some of those records. It is certainly true that there are some discrepancies regarding the details of some of Plaintiffs' absences—whether Plaintiff was in fact scheduled to work on August 2, 2006 but failed to show up, which she does not explicitly dispute but also does not recall (Henny Decl. ¶ 69; *id.* Ex. S, at OMH228); why some of Plaintiff's time sheets are missing; or why Plaintiff received an "unscheduled absence" notation on October 29, a day on which she came to work but was sent home early by her supervisor, for instance, (*id.* ¶ 82; *id.* Ex. R, at OMH217). There is also a clear dispute of fact between the Parties regarding when some of the comments on Plaintiff's probationary reports were written by her supervisors. But any such disputes are not material here, however, for when all is said and done, Plaintiff does not dispute that she was absent or late from work over a dozen times in the space of seven months on the job (as a *probationary* employee);[23] and she does not dispute that she could not recall or could not explain why she had been late or absent on several of these occasions. (Defs.' 56.1 ¶¶ 24, 30, 39.) Plaintiff, with perhaps one exception, has not produced sufficient evidence to create a genuine question of fact on whether Defendants' explanation for their treatment of her—that she was an unreliable employee prone to excessive (and last-minute) tardiness and absence (Patel Decl. ¶ 3)—is false.[24]

---

**23.** The Court counts April 6, 7, 10, and 18; May 5 and 26; July 14; August 2, 11, and 12; and October 28 as Plaintiff's absences, and May 14, June 13, and September 10 as Plain-

tiff's tardies. Plaintiff also "left early" on October 24 and 29.

**24.** Plaintiff argues that had Defendants accommodated her disability, she would have

Moreover, even if Plaintiff *had* shown a basis on which a jury could reject Defendants' explanation, Plaintiff has completely failed to produce any evidence, apart from her own speculation, that Defendants acted in a discriminatory fashion based on her race. *Cf. Edwards*, 2009 WL 6683365, at *7 (noting that "the fact that plaintiff has explanations for some of his absences does not support his claim that defendant retaliated against him for his prior complaint of discrimination"). Plaintiff admits that the only non-African-American employee to whom she compares herself in regard to the question of absences is a man named Bose Matthew, an Indian–American.[25] (Pl.'s 56.1 ¶ 77; Henny Tr. 117 ("[Q:] Besides Mr. Matthew are there any other employees of similar seniority that you allege were not terminated for similar time and attendance issues? [A:] No, sir.").) But Matthew's situation is completely different from Plaintiff's: the undisputed evidence shows that Matthew requested time off on July 30, 2006 until mid August because he had the chicken pox, and re-

turned to work on August 16, 2006. (Ramcharitar Decl. ¶¶ 23–24; *id.* Ex. 2; Henny Decl. Ex. AA, at unnumbered 1, OMH132.) Also, Matthew never had another unscheduled absence while he was a probationary employee. (Ramcharitar Decl. ¶ 24.) Plaintiff argues that Defendants treated Matthew's extended absence as a single occurrence, while her absences that took place as a result of a single incident (the death of her mother-in-law in April 2006, for example) were looked on as separate offenses. (Henny Decl. ¶ 99.) But it is again undisputed that Matthew requested his extended time off in advance of his absences, while Plaintiff's absences were reported to RPC on the day they occurred; per RPC policy, these were "unscheduled." (Ramcharitar Decl. ¶¶ 10–11, 25.)[26] Plaintiff has produced no evidence suggesting that she was remotely similar to Matthew, let alone that the two were "similarly situated in all material respects." *Norville*, 196 F.3d at 95.

Plaintiff is left with her speculation that Patel favored Abraham, a fellow Indian–

---

been absent less frequently. (Henny Decl. ¶ 86.) This may well be true, though it also is worth pointing out Plaintiff's explanations for several of her absences—such as the four absences in April 2006 when her mother-in-law died or her absences in September 2006 for strep throat—have nothing to do with her disability. Moreover, whether it is true or not, it is not evidence suggesting Defendants acted with a discriminatory motive based on Plaintiff's *race*.

In this vein, it is worth noting that Plaintiff argues at length that other African–American employees had significant numbers of absences but were not terminated—presumably with the aim of showing that Defendants' explanation for her treatment in regard to her disability is false. (Henny Decl. ¶¶ 90–98.) Defendant disputes that one of these employees' employment records is as full of absences as is Plaintiff's. (Ramcharitar Decl. ¶¶ 28, 35; *id.* Ex. 4.) But, even viewing the facts in the best light for Plaintiff, while the existence of these employees might undercut Defendants' stated reason for firing Plaintiff in the face of

her disability discrimination claim, they also undermine any inference that Defendants did so *based on discriminatory animus* against African–Americans. *See Adeniji v. Admin. for Children Servs., NYC*, 43 F.Supp.2d 407, 426 n. 7 (S.D.N.Y.1999) (collecting cases holding that plaintiffs had failed to show an inference of discrimination where they were treated less favorably than members of their *own* protected classes).

25. Plaintiff does not discuss Matthew at all in her memorandum in opposition to Defendants' motion.

26. Plaintiff also speculates, based on nothing except that Matthew did not sign one time sheet, that Matthew's time sheets have been doctored. (Henny Decl. ¶ 100.) Plaintiff ignores the other evidence in the record establishing that Matthew was in fact absent for chicken pox in early August 2006, and that he requested the time off in advance.

American, over Plaintiff, and terminated Plaintiff presumably in order to restore Abraham to her position on the early shift. (Henny Decl. ¶¶ 31–42.) But Plaintiff points to absolutely no evidence supporting her view that this was an act of discrimination apart from Abraham and Patel's common ethnicity. While the Court must be "cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question ... a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997); *see also Waters v. Gen. Bd. of Global Ministries,* 769 F.Supp.2d 545, 555 (S.D.N.Y.2011) ("Speculation, conjecture and guess-work cannot substitute for actual evidence. Plaintiff's beliefs cannot replace the admissible evidence required to permit an inference of discrimination and survive summary judgment." (alterations, citations, and internal quotation marks omitted)); *Alphonse v. State of Conn. Dep't of Admin. Servs.,* No. 02–CV–1195, 2004 WL 904076, at *7 (D.Conn. Apr. 21, 2004) ("Courts within the Second Circuit have not hesitated to grant defendants summary judgment in [discrimination] cases where [the] plaintiff has offered little or no evidence of discrimination." (internal quotation marks omitted)). Simply put, Plaintiff has not offered any evidence of discrimination against her because of her race. As noted above, the undisputed evidence is that Plaintiff was absent or tardy on numerous occasions during her relatively few months as a probationary employee, and that at least one other African–American employee was offered the overtime that Plaintiff desired. In this context, Plaintiff's sole reliance on the mere fact that Patel and Abraham had a common ethnicity is insufficient to make out a triable case. *See Turner v. NYU Hosp. Ctr.,* 784 F.Supp.2d 266, 282 (S.D.N.Y.2011) (finding that plaintiff could not survive summary judgment by relying on the "mere fact" that a supervisor and coworker were of the same race and national origin); *cf. Amofa v. Bronx–Lebanon Hosp. Ctr.,* No. 05–CV–9230, 2006 WL 3316278, at *3 (S.D.N.Y. Nov. 13, 2006) (finding that the "mere fact" that a plaintiff and supervisor with whom he argued were of different races was not evidence of discriminatory conduct); *George v. New York City Health and Hosp. Corp.,* No. 02–CV–1818, 2003 WL 289617, at *3 (S.D.N.Y. Feb. 11, 2003) (noting that the "fact that plaintiff and her former supervisor were not of the same race, color and national origin" does not "indicate that the supervisor's conduct towards plaintiff was motivated by discrimination"); *Uddin v. New York City Admin. for Children's Servs.,* No. 99–CV–5843, 2001 WL 1512588, at *3 n. 2 (S.D.N.Y. Nov. 28, 2001) (noting that the common race of plaintiff's supervisors "would ordinarily be irrelevant and would not be worthy of mention" in the Title VII context). Defendants' motion for summary judgment on this claim is therefore granted.

### b. Retaliation

Plaintiff's retaliation claim is that she complained to her supervisors regarding Abraham's receiving a position on the early shift, allegedly in violation of RPC's policies on seniority, and, as a result, Defendants terminated her. (Pl.'s Mem. 22.) Defendants respond that this claim is unexhausted, and that Plaintiff has failed to prove a prima facie case. (Defs.' Mem. 23–25.)

"A Title VII claim requires a claimant to file a complaint with the Equal Employment Opportunity Commission ... or a state equivalent—in this case, the New York State Division of Human Rights ...—within 300 days of the complained-of

acts." *Tamayo v. City of New York*, No. 02–CV–8030, 2004 WL 137198, at *3 (S.D.N.Y. Jan. 27, 2004) (citing 42 U.S.C. § 2000e–5). Failure to comply with this exhaustion requirement ordinarily requires dismissal of a Title VII claim, but a plaintiff may also raise claims for the first time in federal court that are " 'reasonably related to' the allegations contained in her [administrative complaint]." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 83 (2d Cir.2001) (quoting *Butts v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir.1993)). A claim is "reasonably related" to allegations in an administrative charge "where the conduct complained of would fall within the scope of the [administrative] investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.* (internal quotation marks omitted.). This is a "fact-intensive analysis," focusing on whether the "substance of the charge" filed with the administrative agency "gave the agency adequate notice to investigate discrimination on [the] bas[is]" alleged by the plaintiff in his Title VII claim. *Mathirampuzha v. Potter*, 548 F.3d 70, 76–78 (2d Cir.2008).

Plaintiff's New York State Human Rights Division complaint contains two sets of allegations: first, she alleged that she had spoken to Ramcharitar in July 2006 regarding her disability and requesting accommodations, but that Ramcharitar denied these. (Pepper Decl. Ex. 12, at ¶¶ 2–4.) Second, with respect to her race, she alleged that:

> 5. On information and belief, the above named Respondent [Defendants] also denied me equal terms, conditions, and privileges of employment, due to my race and national origin, because Respondent allowed Kamari (Doe), an Asian Indian employee to get a coveted eight (8) hour shift, working from 5:30 am to 2:00 pm, by bypassing the state test, even though Kamari spoke no, or very little English. In addition, Respondent allowed Kamari to start working on this shift early on in her employment with respondent and without having to await and bid on a posting. Even after the shift was posted and bid on, Respondent allowed Kamari to stay in this shift for approximately five (5) weeks, while I had to wait for the posting to clear.
>
> 6. On information and belief, Kamari is a friend and/or family member of Mrs. Patel, an Asian Indian management employee.
>
> 7. On information and belief, Respondent also denied me equal treatment with respect to call outs by counting any individual one of my call outs as more than one instance each, while counting a three (3) week absence by an Asian Indian man that everyone called Boss, who had shingles, as one instance for him.
>
> 8. On November 11, 2006, Respondent terminated my employment.

(*Id.* ¶¶ 5–8.) Plaintiff alleged that these acts were "because of [her] disability, national origin, and race/color." (*Id.* ¶ 9.)

Plaintiff's administrative complaint contained no indication that she believed she had been terminated in retaliation for complaining about Abraham's treatment. Indeed, the administrative complaint does not say that Plaintiff complained at all—the only discussion of Plaintiff's interaction with her supervisors comes in the context of the allegations relating to her disability, not her race.[27]

---

27. Plaintiff does assert that Defendants "terminated [her] in response to her requests for accommodations." (Pl.'s Mem. 22.) Plaintiff does not defend her ADA claim as a valid claim under Title V, however, and has not

Under very similar circumstances, the Second Circuit has held that a retaliation claim was not "reasonably related" to a discrimination charge in an EEOC complaint. *See Mathirampuzha*, 548 F.3d at 76, 78 ("The administrative complaint, in other words, alleged a single act of discrimination: Sacco's aggressive behavior toward the plaintiff on September 29, 2003. Nowhere did the plaintiff assert or imply a retaliatory motive for Sacco's conduct.... The plaintiff's EEO complaint contains no factual allegations sufficient to alert the EEO to the possibility that Sacco's assault was the product of a retaliatory motive."); *see also Fleming v. Verizon N.Y., Inc.*, 419 F.Supp.2d 455, 462 (S.D.N.Y.2005) ("Where the EEOC charge alleges discrimination but not retaliation, the reasonable scope of the agency's investigation cannot be expected to encompass allegations of retaliatory motive." (internal quotation marks omitted)); *Gambrell v. Nat'l R.R. Passenger Corp.*, No. 01–CV–6433, 2003 WL 282182, at *8 (S.D.N.Y. Feb. 3, 2003) (same, where plaintiff did not allege retaliation in EEOC complaint); *Ansley v. Varsity Transit Inc.*, No. 98–CV–1916, 1999 WL 672526, at *4 (S.D.N.Y. Aug. 26, 1999) (denying leave to add Title VII retaliation claim because state administrative complaint did not contain allegation that plaintiff had been the "subject [of] a retaliatory discharge").

▮ Plaintiff asserts that she was proceeding pro se when she filed her administrative complaint. (Pl.'s Mem. 10.) This Court is obligated to construe pro se filings liberally to raise the strongest arguments that they suggest. *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir.2006); *cf. Slade v. Alfred Univ.*, No. 11–CV–396A, 2011 WL 3902752, at *5 (W.D.N.Y. Sept. 6, 2011) (holding that retaliation claim was reasonably related to sexual harassment allegations in Division of Human Rights charge made by pro se litigant where allegations were specific enough that agency "was sufficiently on notice of discriminatory behavior based on sex that it would have investigated whether plaintiff complained to any supervisors and whether anything happened to her in response to those complaints."). But even assuming Plaintiff's administrative complaint had adequately raised a retaliation claim, the claim fails here on the merits.

▮ To support a prima facie case of retaliation under Title VII, a plaintiff must show "(1) she 'engaged in protected participation or opposition under Title VII[,] (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse action.'" *Milne v. Navigant Consulting*, No. 08–CV–8964, 2010 WL 4456853, at *4 (S.D.N.Y. Oct. 27, 2010) (quoting *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205–06 (2d Cir.2006)). A plaintiff may satisfy the first requirement by showing that she "express[ed] opposition to an employment practice[ ] unlawful under Title VII" if she had a "reasonable, good faith belief that the employment practice complained of is unlawful." *Swift v. Countrywide Home Loans, Inc.*, 770 F.Supp.2d 483, 489 (E.D.N.Y.2011) (citations and internal quotation marks omitted). The second requirement, the employer's awareness, means that the employer "understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*,

explained how the evidence shows a prima facie case of retaliation under that statute.

136 F.3d 276, 292 (2d Cir.1998). Assuming, without deciding, that Plaintiff had a "reasonable, good faith belief" that Defendants' allowing Abraham to work the early shift was an unlawful practice *under Title VI*,[28] she nevertheless fails to offer any evidence that she complained about any discrimination contemporaneous to these events or before she was terminated. In particular, Plaintiff admits that at no time during any of her conversations with Patel or Ramcharitar did she say that she felt Abraham was receiving preferences because of her ethnicity, nor did Plaintiff ever say that she was being disfavored because of her race. (Henny Tr. 112–14; Ramcharitar Decl. ¶ 34; Patel Decl. ¶¶ 6–7.) Indeed, the Court invited Plaintiff's counsel at oral argument to point to any evidence in the record that she complained that Abraham's favorable treatment over Plaintiff was based on race or ethnicity, but counsel submitted nothing. Thus, Plaintiff has produced no evidence from which a reasonable jury could conclude that Defendants could have understood Plaintiff's complaints to be about racial or ethnic discrimination. Plaintiff therefore fails to make a prima facie case of retaliation under Title VII, and this claim is also dismissed. *See Taylor v. Runyon*, No. 97–CV–2425, 1997 WL 727488, at *6 (S.D.N.Y. Nov. 20, 1997) (granting a motion to dismiss a retaliation claim where plaintiff did "not establish supervisory awareness of his protected activities"); *Mendoza v. SSC & B Lintas, New York*, 913 F.Supp. 295, 301 (S.D.N.Y.1996) (no *prima facie* case of retaliation where supervisor was not aware of plaintiff's complaint at the time the adverse employment action taken).

28. Plaintiff only alleges that she thought Defendants were violating their own internal policies on seniority, though she also testified that she expressed to some co-workers that she thought Abraham might have been fa-

*III. Conclusion*

For the reasons stated herein, Defendants' motion for summary judgment is granted. The Clerk is respectfully directed to enter judgment for Defendants, terminate the pending motion (Dkt. No. 33), and close this case.

SO ORDERED.

vored by Patel because of her personal connection to Abraham and/or ethnicity. (Henny Tr. 114.) There is no evidence her supervisors heard these statements or were otherwise ever aware of them.